Robert L. Starr (183052)
robert@starrlaw.com
Adam M. Rose (210880)
adam@starrlaw.com
Theodore R. Tang, Esq. (313294)
theodore@starrlaw.com
**THE LAW OFFICE OF ROBERT L. STARR, APC**
23901 Calabasas Road, STE #2072
Calabasas, CA 91302
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Jordan L. Lurie, State Bar No. 130013
jllurie@pomlaw.com
Ari Y. Basser, State Bar No. 272618
abasser@pomlaw.com
**POMERANTZ LLP**
1100 Glendon Avenue
15th Floor Los Angeles, CA 90024
Telephone: (310) 432-8492

Manny Starr (319778)
manny@frontierlawcenter.com
**FRONTIER LAW CENTER**
23901 Calabasas Road, #2074
Calabasas, CA 91302
Telephone: (818) 914-3433
Facsimile: (818) 914-3433

*Attorneys for Plaintiff Mario Briones Ortiz*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| MARIO BRIONES ORTIZ, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS, LLC, and DOES 1 to 10,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR:**<br><br>Violation of Bus. & Prof. Code § 17200, *et seq.*, |

Plaintiff Mario Briones Ortiz ("Plaintiff") hereby brings this class action on behalf of himself, and all others similarly situated, against Defendants General Motors, LLC, ("GM" or "Defendant") and Does 1 to 10. This action is based on personal knowledge relating to Plaintiff's own actions, facts that are a matter of public record, and on information and belief based on the investigation of counsel.

## INTRODUCTION

1.     This consumer class action arises out of GM's failure to properly identify the bumper shutter grills (also referred to as grill or grill shutters or bumper shutters) in 2017- 2019 Chevrolet Silverado, 2017-2019 GMC Sierra, 2017-2019 Chevrolet Suburban, 2017-2019 GMC Yukon and 2017-2019 Cadillac Escalade vehicles, all of which are distributed by GM ("Class Vehicles"), as high-priced parts covered under the California Emissions Warranty (California Code of Regulations ("CCR") Title 13, Section 2035 *et seq*.) and failure to pay for the diagnosis, repair, and replacement of the bumper shutter grills for 7 years or 70,000 miles in violation of the California Emissions Warranty. .

2.     As a result of GM not providing proper warranty coverage for bumper shutters in Class Vehicles, Plaintiff and members of the Classes have paid, and are continuing to pay, out of pocket for repairs that should be covered under the California Emissions Warranty.

3.     GM's conduct violates, and continues to violate, California's unfair business practices statute, California Business and Professions Code Sections 17200 *et seq*. (the "UCL"). Plaintiff also seeks public injunctive relief pursuant to the UCL.

## PARTIES

4.     Plaintiff Mario Briones Ortiz ("Plaintiff" or "Briones-Ortiz") is, and at all times relevant hereto has been, an individual. At all times relevant, Plaintiff resided in Dublin, California in Alameda County.  Plaintiff had his vehicle diagnosed by a factory authorized GM dealership located in Alameda County, wherein it was identified that repairs to parts that should be covered under the California Emissions Warranty were needed, and wherein coverage was denied.

5. Defendant GM is organized under the State of Delaware with its business address at 300 Renaissance Center, Detroit, Michigan. GM is a citizen of Delaware and Michigan.

6. All acts and omissions of GM's employees, agents, associates, partners, parents, or subsidiaries as alleged herein occurred while they were acting within the course and scope of their duties and GM is therefore responsible to Plaintiff under the doctrine of Respondeat Superior and/or other doctrines.

7. Plaintiff is unaware of the true names or capacities of the Defendants sued herein as Does 1 through 10, ("Doe Defendants"), and therefore sues said Doe Defendants by such fictitious names. Plaintiff will amend this Complaint to insert the true names and capacities of such Doe Defendants when such information has been obtained. Plaintiff is informed and believes, and based on such information and belief alleges, that each of the fictitiously named Doe Defendants participated in some way in the wrongful acts and omissions alleged herein.

8. Plaintiff reserves the right to expand, limit, modify, or amend these allegations at any time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because: (i) members of the Classes are citizens of a state different from that of GM; and (ii) aggregating the claims of individual Class members, the total matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs. Further, 28 U.S.C. § 1332(d)(5) does not apply because (i) GM is not a state, state official, or other governmental entity against whom the Court may be foreclosed from ordering relief, and (ii) the number of members of the Classes in the aggregate exceeds 100.

10. This Court has jurisdiction over GM because GM is a limited liability company that is deemed a citizen of every state of which its members are citizens. GM LLC is a Delaware limited liability company with its principal place of business in Michigan. The sole member of GM LLC is General Motors Holdings LLC, a Delaware limited liability company with its principal place of

business in Michigan. The sole member of General Motors Holdings LLC is General Motors Company, which is a Delaware corporation with its principal place of business in Michigan. GM LLC, therefore, is a citizen of Delaware and Michigan for purposes of diversity jurisdiction.

11.     GM has sufficient minimum contacts with California, having sold Class Vehicles in the State of California, and having intentionally availed itself of the California market so as to render the exercise of jurisdiction over it by this District Court consistent with traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because GM conducts business within the State of California, and a substantial part of the events giving rise to the claims alleged herein occurred in this District.

## BACKGROUND

### Regulatory Framework

13.     In order to understand the effect of Defendant's wrongful conduct, it is important to identify the regulatory provisions at issue.

14.     California Health & Safety Code Sections 43200 empowered the California Air Resources Board ("CARB") to adopt Regulations governing vehicle emissions.  Section 43205 states, in relevant part, that:

(a)     Commencing with the 1990 model-year, the manufacturer of each light-duty and medium-duty motor vehicle and motor vehicle engine shall warrant to the ultimate purchaser and each subsequent purchaser that the motor vehicle or motor vehicle engine meets all of the following requirements:

(1)     Is designed, built, and equipped so as to conform with the applicable emissions standards specified in this part.

(2)     Is free from defects in materials and workmanship which cause the motor vehicle or motor vehicle engine to fail to conform with applicable requirements specified in this part for three years or 50,000 miles, whichever first occurs.

(3)     Will, for a period of three years or 50,000 miles, whichever first occurs, pass a test

1   established under Section 44012 [i.e., Smog Test] . . .

2     (4)  Is free from defects in materials and workmanship in emission related parts . . .

3     15.  Health and Safety Code Section 39027.3 defines an "emissions-related motor

4   vehicle part" as any automotive part "that may affect emissions from a motor vehicle, including

5   replacement parts, consolidated parts, rebuilt parts, remanufactured parts, add-on parts, modified

6   parts, and specialty parts."

7     16.  Title 13 (Motor Vehicles), Division 3 (Air Resources Board), Chapter 1, Article 6,

8   Section 2035 et seq. sets forth the statutory emissions warranty *i.e.*, the California Emissions

9   Warranty, adopted by CARB pursuant to Health & Safety Code Section 43205.

10     17.  Section 2035(c)(2)(3)(b) states, in relevant part, that a "Warranted Part" under the

11   California Emissions Warranty is "any part installed on a motor vehicle or motor vehicle engine by

12   the vehicle or engine manufacturer or installed in a warranty repair *which affects any regulated*

13   *emission* from a motor vehicle or engine which is subject to California emission standards."

14   (Italics added).[1]

15     18.  Chapter 1, Article 1, Section 1900(b)(3) also defines an "emissions-related part" as

16   "any automotive part which *affects any regulated emission* from a motor vehicle which is subject to

17   California or federal emission standards." Italics added.

18     19.  A "regulated emission" under these Regulations refers to greenhouse gas emissions,

19   including carbon dioxide emissions. 13 CCR Section 1950, et seq.

20     20.  A vehicle or engine part whose defect "affects regulated emissions" is referred to as

21   an "emissions-related part."  Specifically, Section 1900(b)(3) describes an "emissions-related part"

22   under the California Emissions Warranty as "any automotive part, *which affects regulated emission*

23   from a motor vehicle which is subject to California or federal emissions standards. This includes, at

24

25

26   [1] (Section 2035 was recently amended to add provisions regarding trailers and diesel powered heavy
    duty vehicles.  This changed the subsection numbering on Section 2035, but not the content.
27   Plaintiff's allegations refer to the Section 2035 subsection numbers that were in place prior to the
    amendment, when Defendant's obligations arose and when the vehicles at issue in this action were
28   certified for sale in California.)

a minimum, those parts identified in the "Emissions-Related Parts List," adopted by the State Board [CARB] on November 4, 1977, as last amended June 1, 1990." (Italics added).

21.     Similarly, Section 2601(i) also states that an "'Emissions-related part' means any vehicle part which affects any regulated emissions from a vehicle that is subject to California or federal emissions standards and includes, but is not limited to, those parts specified in the 'Emissions-Related Parts List,' adopted by the State Board on November 4, 1977, as last amended June 1, 1990."

22.     Therefore, any part that "affects regulated emissions" and/or is identified on the "Emissions-Related Parts List," adopted by the State Board on November 4, 1977, as last amended June 1, 1990 (the "June Emissions-Related Parts List") is an emissions-related part required to be covered under the California Emissions Warranty.

23.     In addition, as defined by Section 2037(b), a "warranted part" under the California Emissions Warranty also includes a vehicle or engine part that can, or is required to, illuminate the vehicle's OBDII Malfunction Indicator Light (MIL) in the event of a malfunction, even if the primary function of the component is not emission control. (This definition is also confirmed in the CARB Declaration discussed below.)

24.     In other words, a defect in materials and workmanship in *any vehicle or engine part*, even a part whose primary function is not emission control or is not identified by name on the June Emissions-Related Parts List, will also be deemed a "warranted part" and covered under the California Emissions Warranty when a defect in that part causes the vehicle's MIL to illuminate. This is because such a defect prevents the underlying warranted part in the vehicle or engine from performing as required in the vehicle's application for certification, as set forth in Section 2037(b)(2).  Indeed, Section IX of the June 1990 Emissions-Related Parts List discussed below specially includes coverage for "Miscellaneous Items" used in various vehicle systems and whose primary function is not emission control.

25.     Section 2037(b) provides, in relevant part, that the manufacturer of each motor vehicle or motor vehicle engine shall warrant to the ultimate purchaser and each subsequent purchaser that the vehicle or engine is:

(1)     Designed, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board pursuant to its authority in chapters 1 and 2, part 5, division 26 of the Health and Safety Code; and

(2)     Free from defects in materials and workmanship which cause the failure of a warranted part to be identical in all material respects to the part as described in the vehicle or engine manufacturer's application for certification, including any defect in materials or workmanship which would cause the vehicle's on-board diagnostic malfunction indicator light to illuminate, for a period of three years or 50,000 miles, whichever first occurs.

26.     Section 1968.2 further confirms that illumination of the MIL correlates with a defect in an emissions-related part.  Section 1968.2 specifically mandates that the MIL should not illuminate unless the part has an emissions-related defect.

27.     As further described below regarding the OBDII System, all vehicles must be equipped with an OBDII onboard diagnostic system.  The purpose of the OBDII system is specifically to monitor emissions-related components, and all vehicle manufacturers are required to provide to CARB "OBDII Summaries" or "OBDII Tables" that identify all fault codes that are emissions-related.  When a defect triggers a fault code monitored by the OBDII system and the MIL illuminates, that is confirmation that the defect is "emissions-related."  Therefore, when a defect that triggers a fault code monitored by the OBDII system causes the MIL to illuminate, the repair must be performed under the California Emissions Warranty.

28.     Stated differently, the definition of a warranted part as any part that "affects regulated emissions" is very broad.  The foregoing framework puts particulars to that broad definition, provides a limiting principle, and precludes any potential "slippery slope" argument or concern that every vehicle part could potentially be "emissions-related" because it "affects regulated emissions."  In addition to the parts specifically identified on the "June 1990 Emissions-

-6-
CLASS ACTION COMPLAINT

Related Parts List," Defendant is required to cover under the California Emissions Warranty any part, component or system whose defect triggers fault codes identified on the OBD2 Summary Tables and causes the MIL to be illuminated as set forth in the OBD2 Summaries.  If a defect in a part, component or system triggers fault codes identified on Defendant's OBD2 Summary Tables and causes the MIL to be illuminated, that part unquestionably "affects regulated emissions," is an "emissions-related" part and is required to be covered under the California Emissions Warranty, even if the primary function of that part is not emission control.

29.     As further described below, the OBDII system in Plaintiff's vehicle detected a fault code that caused the MIL to illuminate and that correlated with the bumper shutter, thereby confirming that the bumper shutter defect "affects regulated emissions" and is "emissions-related."

30.     In addition to the foregoing, Section 2038(b) requires that manufacturers warrant that the vehicle or engine will pass a smog test.  As Section 2038(b) states, the manufacturer must warrant that:

(1)     Is designed, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board pursuant to its authority in chapters 1 and 2, part 5, division 26 of the Health and Safety Code; and

(2)     Will, for a period of three years or 50,000 miles, whichever first occurs, pass an inspection established under section 44012 of the Health and Safety Code [*i.e.*, a smog test].

31.     As further described below, a vehicle with a defect that increases regulated emissions or triggers an OBDII fault code and illuminates the MIL will not pass a smog test.

32.     Section 2035(c)(1) defines a "Warrantable Condition" under the California Emissions Warranty as "any condition of a vehicle or engine which triggers the responsibility of the manufacturer to take corrective action pursuant to sections 2036, 2037 or 2038" and confirms that the California Emissions Warranty covers design defects and defects in materials and workmanship which cause the failure of a warranted part.

33.     Section 1962.1 provides that the warranty period for emissions-related parts in PZEV vehicles is extended from 3 years or 50,000 to 15 years or 150,000 miles and is extended from 3 years or 50,000 to 7 years or 70,000 miles for "high-priced" emissions-related parts.

**"High-priced Parts"**

34.     Section 2037(b)(3) and Section 2037(b)(3)(c) address "High-Priced" Warranted Parts *i.e.*, emissions-related parts that are also "high-priced," as defined by the Regulations. For "high-priced" warranted parts, the warranty period is extended from 3 years or 50,000 miles to 7 years or 70,000 miles, whichever comes first.

35.     A "high-priced" warranted part is defined as a warranted part whose individual replacement cost at the time of certification exceeds the "cost limit" set forth by the Regulations. Section 2037(c)(1) states, in relevant part, that in calculating whether an individual replacement cost at the time of certification exceeds the cost limit, "the replacement cost shall be the *retail cost* to a vehicle owner and include the cost of the part, labor, and standard diagnosis." Italics added. Similarly, Section 2037(c)(2) states that "the replacement cost shall be the *retail cost* to a vehicle owner and include the cost of the part, labor, and standard diagnosis." Italics added. The costs shall be those of the highest-cost metropolitan area of California.

36.     The cost limit for determining a particular part's individual replacement cost at the time of certification shall be calculated using the following equation:

Cost limit$_n$ = $300 x (CPI$_{n-2}$ / 118.3) where:

Cost limit$_n$ is the cost limit for the applicable model year of the vehicle rounded to the nearest ten dollars.

n is the model year of the new vehicles.

n-2 is the calendar year two years prior to the model year of the new vehicles.

CPI is the annual average nationwide urban consumer price index published by the United States Bureau of Labor Statistics

37.     If, upon conducting this calculation, the price of replacement exceeds the cost limit, the part is a "high-priced" warranted part, and the manufacturer is statutorily required to extend warranty coverage for the part's repair or replacement to 7 years or 70,000 miles.

1     38.    Section 2037(f) provides that each manufacturer shall furnish with each new vehicle

2  or engine a list of the "high-priced" warranted parts for that vehicle.  Each manufacturer also is

3  required to submit to CARB the documentation used to identify the "high-priced" warranted parts.

4  The documentation shall include the estimated retail parts costs, labor rates in dollars per hour, and

5  the labor hours necessary to diagnose and replace the parts.

6     39.    With respect to both "emission-related parts" and "high-priced" parts, Section

7  2037(d) of the California Emissions Warranty provides, in relevant part, that "the repair or

8  replacement of any warranted part shall be performed at no charge to the vehicle or engine owner at

9  a warranty station" and that "the vehicle or engine owner shall not be charged for diagnostic labor

10  which leads to the determination that a warranted part is defective, provided that such diagnostic

11  work is performed at a warranty station."

12                     **The CARB Declaration**

13     40.    CARB has provided a Declaration from Allen Lyons, (who was the Chief of the

14  Emissions Certification and Compliance Division of CARB when the Declaration was provided)

15  regarding the California Emissions Warranty (the "CARB Declaration") "for the sole purpose of

16  educating the Courts about CARB's interpretation and implementation of California's warranty

17  requirements." The CARB Declaration sets forth CARB's interpretation of certain of the foregoing

18  CCR provisions, including how to define a "warranted part" for purposes of the California

19  Emissions Warranty and how to properly determine whether an emissions part is also a "high-

20  priced emissions part" entitled to extended warranty coverage for 7 years and 70,000 miles.

21     41.    The CARB Declaration states, in relevant part, that "A part subject to California's

22  vehicle emission warranty is called a warranted part" under Section 2035.  The CARB Declaration

23  provides that "warranted parts under the California Emissions Warranty include any components

24  that can or are required to illuminate the OBD Malfunction Indicator Light (MIL) in the event of a

25  malfunction, *even if the primary function of the component is not emission control, within the*

26  *warranty period*. (Cal. Code Regs., tit. 13, § 2037, subd. (b)(2).)  (Italics added).  The MIL is a

27  light located on the driver's side instrument panel that, when illuminated, is amber in color and

28

displays "Check Engine/Powertrain," "Service Engine/Powertrain Soon," or the International

Standards Organization (ISO) engine symbol; the MIL illuminates to notify the driver of detected

malfunctions of OBD-monitored emissions systems on the vehicle. (Cal. Code Regs., tit. 13, §

1968.2, subds. (a), (d)(2.1.1) & (2.2.).)"

42.     The CARB Declaration further provides: "One specific type of warranted part is an

"emissions-related part." (Cal. Code Regs., tit. 13, § 2035, subd. (c)(2)(B).)  An 'emissions-related

part' is defined in California Code of Regulations, title 13, section 1900, subdivision (b)(3), as any

automotive part, which affects any regulated emissions from a motor vehicle which is subject to

California or federal emission standards. This includes, at a minimum, those parts specified in the

"Emissions-Related Parts List," adopted by the State Board on November 4, 1977, as last amended

June 1, 1990."

43.     Thus, the CARB Declaration further confirms that "emissions-related parts" under

the California Emissions Warranty are parts who failures can, or are required, to illuminate the

MIL and are not limited to the emissions control system only.

44.     The CARB Declaration further provides that "When calculating the cost of labor

portion of the replacement cost equation, in order to determine if a part is a "high-priced"

warranted part for the purposes of California Code of Regulations, title 13, section 2037,

subdivision (c), manufacturers first calculate the amount of time it would take to diagnose and

repair or replace the part (the labor hours). A dollar amount is then attributed to the number of

labor hours to come up with a cost of labor for each part. In doing this, manufacturers should use

the labor hours and associated costs that would be charged to consumers to perform any required

diagnosis and repairs to or replacement of the part, not the labor hours that manufacturers' service

dealerships are allowed to charge manufacturers."

**The OBDII Fault Code System**

45.     As referred to above, the Class Vehicles are equipped with an OBDII onboard

diagnostic system.  According to CARB's website, the "OBD system monitors virtually every

component that can affect the emission performance of the vehicle to ensure that the vehicle

remains as clean as possible over its entire life.  *If a problem with an emissions-related component is detected, the OBD system illuminates a warning lamp on the vehicle instrumental panel to alert the driver*.  The system will also store important information about the detected malfunction so that a repair technician can accurately find and fix the problem."  Emphasis added.

46.     Further, CARB's On-Board Diagnostic II (OBDII) Systems Fact Sheet (on the CARB website) states, in relevant part, that "*California's emission warranty requires the vehicle manufacturer to repair under warranty any problem that the OBD II system detects* if the vehicle is less than 3 years old and has less than 50,000 miles. Manufacturers only authorize their dealers to perform warranty work. Further, components which exceed a defined cost limit at the time the vehicle was produced (currently about $600) are covered for 7 years or 70,000 miles - *this list of covered parts, which varies from car to car, should be listed in the owner's manual or accompanying warranty booklet that came with the vehicle*.

47.     The system uses sensors to gather data which is evaluated using OBDII fault code logic. If the OBDII fault code logic determines that the data is outside of an acceptable range, a fault code is triggered, identifying a defect which increases regulated emissions.  If a failure of a component or system would cause an increase of the vehicle emission above the OBDII limits, the MIL has to illuminate.  When Defendant seeks certification of vehicles for distribution in California, Defendant is required, pursuant to Section 1968.2, to provide CARB with all of Defendant's OBDII fault codes and the corresponding logic.  The fault codes for Defendant's vehicles are identified in a document entitled "OBD2 Summary Tables."  Defendant submitted OBD2 Summary Tables or similar documents to CARB for every Class Vehicle and for every model year that the vehicles were certified for sale in California.

48.     The "OBD2 Summary Tables" identify the Components/Systems monitored by OBDII, the acceptable ranges relating to the data gathered, the corresponding emissions fault codes and that the MIL will be triggered when a defect is identified.  The purpose of the OBDII system, as confirmed in the CCR, is specifically to monitor emissions-related components. This is why Defendant is required to develop a compliant OBDII system which identifies emissions related

defects, triggering a fault code and a MIL. The fault codes are used to assist technicians in repairing vehicles, whereas the MIL is used to alert the driver of a defect. Defendant is required to cover under the California Emissions Warranty any defect that triggers a fault code identified by Defendant in its OBD2 Summaries submitted to CARB or that should properly be identified on the OBD2 Summaries because such a defect affects regulated emissions.

49.     This means that every defect that triggers the emissions fault codes identified by Defendant in the "OBD2 Summary Tables" and the MIL is, by definition, an emissions-related defect.  The MIL illuminates to notify the driver of detected malfunctions in the vehicle's on-board diagnostic emission systems. In layman's terms, this means that when the MIL is illuminated, an emissions-related defect has been detected in the vehicle.

50.     Defendant knows which fault codes trigger illumination of the MIL because Defendant is responsible for making sure that the vehicles it distributes in California have CARB compliant OBD2 systems, and Defendant is required to provide to CARB all the fault codes that trigger a MIL and the specific emissions-related conditions that trigger the fault codes as set forth in the OBD2 Summaries.  Further, as confirmed in the CARB Declaration, Defendant is required to identify to CARB all components that "can" or are required to illuminate the MIL in the event of a malfunction, even if the primary function of the component is not emissions control.

51.     A fault code and illumination of the MIL indicates that the OBDII system has detected a fault but does not necessarily identify the specific part that needs to be repaired or replaced.  Further diagnostics are required.  Manufacturers, such as Defendant, have detailed diagnostic and logic charts to trace the fault code to a specific component.

**The June 1990 Emissions-Related Parts List**

52.     As described above, on or about November 4, 1977, CARB published an "Emissions-Related Parts List."  This List was amended in November 1981 and in June 1990.  The June 1990 Emissions-Related Parts List identifies a list of components that are "examples of emission related parts as defined in Section 1900(b)(3), Chapter 3 [sic], Title 13, California Code of Regulations."  Therefore, at a minimum, Defendant is required to cover as "emissions-related"

parts under the California Emissions Warranty any vehicle part or system specifically identified on the June 1990 Emissions-Related Parts List.

53.     However, the June Emissions-Related Parts List is non-exclusive by its own terms, nor could it be all-inclusive, as it could not include parts, components, systems or technology developed or implemented after 1990.

**The Role of CARB**

54.     Plaintiff's claim does not depend on the premise that CARB was deceived by the information that Defendant submitted, or that CARB ever expressed a concern about Defendant's classification of components as being covered by the California Emissions Warranty.  Plaintiff is not accusing CARB of mismanagement or blaming CARB for Defendant's inaccuracy.  Defendant alone is responsible for selecting and identifying to CARB the parts that Defendant has unilaterally identified as being covered by the California Emissions Warranty, as part of its application for vehicle certification. That list may be correct as far as CARB may know. But, as Plaintiff alleges, the list of parts Defendant submitted to CARB was incomplete, as evidenced by Plaintiff's own experience.

55.     By asserting the claims herein, Plaintiff is not asking for judicial assumption of the role of CARB.  To the contrary, Plaintiff is seeking for the Court to perform an ordinary judicial function, namely, to grant relief under the UCL for business practices made unlawful by statute and to determine, by using the Court's basic factfinding and statutory interpretation litigation tools, whether Defendant is complying with the California Emissions Warranty law or flouting it systematically.

56.     Further, to the extent that there is any doubt as to whether this Court would be assuming, interfering with, or usurping the functions of CARB, the CARB Declaration makes CARB's intentions clear. The CARB Declaration states that the Declaration is provided "for the sole purpose of educating the Courts about CARB's interpretation and implementation of California's warranty requirements." The CARB Declaration confirms that CARB does not consider this matter exclusively within its purview and expects the Court to adjudicate these issues.

**PLAINTIFF'S VEHICLE**

57.     At all times herein relevant, Plaintiff was and is the owner of a used 2017 GMC Sierra 1500, VIN 3GTU2NEJ1HG124084 ("Plaintiff's Vehicle"). Plaintiff's Vehicle was originally distributed as a new vehicle in the State of Nebraska and originally registered in the State of Nebraska.

58.     On September 4, 2022, Plaintiff purchased Plaintiff's Vehicle as a used vehicle from Stevens Creek Chevrolet, located in San Jose, California, and Plaintiff's Vehicle was registered in the State of California.

59.     Pursuant to 13 CCR 2035, the California Emissions Warranty applies to Plaintiff's Vehicle because at all times relevant, *i.e.*, at the time of the vehicle repair referenced in this Complaint, Plaintiff's Vehicle was registered in the State of California. Specifically, 13 CCR 2035(b) states, "This article shall apply to: (1) California-certified 1979 and subsequent model motorcycles, passenger cars, light-duty trucks, medium-duty vehicles, and heavy-duty vehicles, registered in California, regardless of their original point of registration; and (2) California certified motor vehicle engines used in such vehicles."

60.     Plaintiff had been experiencing problems with Plaintiff's Vehicle. As a result, on or about February 21, 2023, at 51,224 miles, Plaintiff took Plaintiff's Vehicle to Dublin Buick GMC, located at 4400 John Monego Ct., Dublin, California 94568 ("the Dealership").

61.     According to the repair record, the Dealership verified that the engine light is on, ran tests and reprogrammed the ECM.  The Vehicle was still experiencing problems.  According to the repair record, "TECH STARTED VEHICLE AND VEHICLE HAD A SLOW CRANK AND THE CHECK ENGINE LIGHT CAME BACK ON. TECH SCANNED VEHICLE AND DTC:P2101 HAS PASSED AND IS NOT THE CAUSE OF THE CHECK ENGINE LIGHT AT THIS TIME. TECH INSTEAD FOUND DTC: U1510: LIN BUS FOR ACTIVE GRILL SHUTTER. TECH USED SCAN TOOL TO COMMAND SHUTTERS TO OPEN AND CLOSE POSITION. SHUTTER IS RECEIVING COMMAND BUT IS NOT MOVING SHUTTERS. TECH REC REPLACE ACTIVE GRILL SHUTTER."

62.     The repair record indicates a general diagnostic fee of $195, referenced in the repair record as, "check-service engine soon light is on, check for codes and report" was charged to Plaintiff. This fee related to diagnosing what was wrong with Plaintiff's Vehicle.

63.     During the process of diagnosing what was wrong with Plaintiff's Vehicle, the Dealership found that Plaintiff's vehicle was due for a software update, and performed the software update free of charge, referencing warranty claim code 11YN157616792, relating to General Motors Technical Service Bulletin 18-NA-037. Performing the update referenced in the Bulletin did not resolve the problem with Plaintiff's Vehicle. The diagnostic fee charged to Plaintiff was not increased or impacted in any way by the determination that the software update was necessary or by the performance of the software update.

64.     After performing the software update, the technician working on Plaintiff's Vehicle found DTC U1510, indicating a problem with the active grill shutter. The technician found that the active grill shutter was defective and replaced it at a labor cost of $331.50. The charge of $331.50 was exactly 1.7 hours of time, charged at a rate of $195.00 per hour. Alldata, an aggregator of automotive repair costs, confirms that the time to replace the active grill shutter for Plaintiff's Vehicle is 1.7 hours.

65.     The repair record indicates that the part cost for the active grill shutter was $375.71.

66.     The repair record indicates that the total cost to diagnose and repair the active grill shutter was $902.21 plus tax.

67.     The California Air Resources Board has indicated in Manufacturer Advisory Correspondence (MAC) 2016-1 that for model year 2017 vehicles, if the total cost of parts and labor to diagnose, then either repair or replace an emissions related part, exceeds $600.00, the part is a high-priced part, covered for 7 years or 70,000 miles.

68.     As explained herein, the active grill shutter is a high-priced emissions part because the repair or replacement of the active grill shutter exceeded $600 based on the repair records.  As a result, the active grill shutter should have been designated as a high-priced warranted part and received 7-year/70,000-mile warranty coverage.

69.     However, GM failed to cover the repair or replacement of the grill shutter part under the California Emissions Warranty either because GM failed to perform any high-priced calculation for this part or because GM used the "warranty pay rate," instead of the "consumer pay rate," to perform the high-priced calculation.

70.     On information and belief, GM systemically has been using the wrong standard for calculating the retail labor cost in determining whether a part is a "high-priced part" under the California Code of Regulations. Instead of using the retail labor cost i.e., the number of labor hours that the customer pays for the repair ("customer pay"), GM uses, and has always used, the number of hours that the manufacturer pays its dealers to perform the repairs under warranty ("warranty pay"), which is a lesser amount. As a result, GM is grossly understating the parts that are designated as high-priced warranted parts under the CCR, including, in this case, the grill shutter.

71.     GM's conduct violates, and continues to violate, California's unfair business practices statute, California Business and Professions Code Sections 17200, *et seq.* (the "UCL").

72.     Plaintiff and other Class members have suffered damage as a result of GM's wrongful, unfair, and unlawful conduct.

## GRILL SHUTTERS ARE EMISSIONS-RELATED PARTS

73.     Defendant's California Emissions Warranty for the Class Vehicles identifies only a handful of emissions parts that Defendant contends qualify for the California Emissions Warranty's warranty coverage as high-priced parts.  By narrowly self-defining the parts that are required to be covered under the California Emissions Warranty as high-priced parts, Defendant is able to reduce the amount of money that it spends on warranty-related repairs, knowing that most if not all dealerships or consumers will not investigate or understand what components should actually and correctly be covered under the California Emissions Warranty as high-priced parts, pursuant to the California Code of Regulations.

74.     This action focuses on the grill shutters in the Class Vehicles. As set forth below, the grill shutters in the Class Vehicles are entitled to extended warranty coverage under the

California Emissions Warranty as high-priced parts for 7 years or 70,000 because they satisfy the Regulatory prerequisites.

75.     In order to establish that the grill shutter should be designated as a "high-priced" warranted part, Plaintiff must first establish that the part is "emissions-related."

76.     On information and belief, GM covers the grill shutters in certain Class Vehicles as an emissions-related part.  GM refers to the grill shutter as the "Active Aero Shutter and Controller."

77.     To the extent that the grill shutter is not covered as an emissions-related part in any Class vehicle, the evidence is incontrovertible that the grill shutter is an emissions-related component. The grill shutter is a "warranted part" because a defect or failure in the grill shutter will cause an increase in "regulated" emissions; will cause the "check engine" light to illuminate; and will cause the vehicle to fail a smog check.  As alleged herein, the grill shutter should have been classified as a high-priced emissions part entitled to warranty coverage for 7 years or 70,000 miles.

///

///

**A Defect in the Grill Shutter Affects Regulated Emissions**

78.     If the grill shutter fails to work properly as described herein, it affects regulated emissions, as follows.

79.     The grill shutter is located at the front bumper lower opening. This system controls the amount of airflow into the engine compartment via a flap which is operated by an actuator that receives signals from the ECM.

80.     Grill shutters are designed to open and close to control the airflow through the vehicle's radiator and engine bay. The purpose of these shutters is to optimize the vehicle's aerodynamics and improve fuel efficiency. By dynamically adjusting the airflow through the radiator and engine bay, the grill shutter helps balance the needs of cooling and aerodynamics and reduces the amount of time it takes to heat up an engine, all of which reduce regulated emissions. While driving, the grill shutter system opens or closes the shutter to reduce or increase air flow to

the engine compartment for the purpose of reducing aerodynamic drag and heating up the engine more rapidly thus reducing emissions, and as a result improves the vehicle's fuel efficiency. Indeed, the only purpose served by grill shutters equipped on Class Vehicles is to reduce fuel consumption and $CO_2$ emissions.  This ability to control airflow leads to improved fuel efficiency and reduced emissions.

81.     The basic premise behind the operation of the grill shutters is that the shutters close in instances when increasing engine temperature is needed in order to reduce emissions and open in instances when cooling airflow to the engine is needed, like when towing, climbing a steep grade, or in other situations that powertrain temperatures rise above certain threshold conditions.  The shutters also close on the highway when engine cooling needs are reduced, thereby reducing aerodynamic drag and maximizing aerodynamic efficiency by pushing more air around the vehicle.

82.     When the engine requires cooling, such as during high load or elevated temperatures, the grill shutter opens to allow airflow to pass through the radiator and other heat exchangers. This ensures that sufficient cooling air reaches the engine components, including the radiator, condenser, and intercoolers (if equipped).

83.     When the engine does not require as much cooling, such as during low-speed or steady-state cruising, the grill shutter closes to optimize the vehicle's aerodynamics by rerouting air around the vehicle to reduce aerodynamic drag and fuel consumption. By closing the shutter, the vehicle reduces drag and improves fuel efficiency. This is because less air is allowed to flow into the engine bay, reducing the resistance against the vehicle's forward motion. Thanks to improved vehicle aerodynamics with the shutters closed, the fuel consumption and $CO_2$ emissions are reduced significantly.

84.     On information and belief, when fully closed, the reduction in drag can reduce CO2 emissions by close to 2%.

85.     Furthermore, keeping the shutter closed when the engine is cold allows the engine to warm up more rapidly, allowing the engine to go into an operational program referred to as "closed loop." "Closed loop" cannot be achieved until a vehicle's engine is at a pre-determined minimum

1  temperature. The process of heating the engine up, when the engine is cold, to the pre-determined
2  minimum temperature, is accelerated by closing the shutter. This is because closing the shutter does
3  not allow the engine to be cooled by air that would otherwise flow through the open shutter and
4  through the engine. When a vehicle is in "closed loop", the vehicle's engine control module will
5  continuously receive and process data from the oxygen sensor, coolant temperature sensor and
6  other engine sensors, and use this data to continually adjust the engine's air to fuel mixture based
7  upon the data received, in order to adjust the air to fuel mixture. The data constantly changes while
8  the engine is on, based upon engine speed, road grade, elevation, driving pattern, and other
9  conditions which are constantly changing while the engine is on. The purpose of the continuous
10 adjustment of the air to fuel mixture is to achieve maximum fuel efficiency.

11        86.    A defective grill shutter increases regulated emissions, because it does not perform
12 those functions described herein which reduce emissions. As described above, if the bumper shutter
13 grill is defective and remains closed or partially closed when it should be open, this impacts the
14 airflow through the radiator and engine bay, leading to increased engine temperatures, reduced
15 cooling efficiency, and performance issues.  The engine will run hotter than optimal, causing the
16 engine to run less efficiently, burn more fuel, and produce more emissions. When the engine
17 overheats due to poor cooling airflow, it negatively impacts combustion efficiency and increases
18 emissions. An engine operating at higher temperatures experiences incomplete combustion, leading
19 to higher levels of regulated pollutants such as nitrogen oxides (NOx), carbon monoxide (CO), and
20 hydrocarbons (HC). Excessive engine heat also results in increased evaporative emissions. If the
21 shutter is stuck in the open position, the vehicle's aerodynamics are compromised, resulting in
22 increased drag and fuel consumption. More fuel burned means higher CO2 emissions.

**A Defect in the Grill Shutter Triggered an OBDII Fault Code**

**and Caused the MIL to Illuminate**

25        87.    The fault code identified on Plaintiff's repair order further confirms a defect relating
26 to an emissions related part.

88.     The check engine light on GM applications illuminates for codes related to the shutter system. Codes are generated through the LIN BUS network. For example, U1510 (Lost communication with Active Grill air shutter actuator) is a common failure code indicating a fault in the active shutter management. The defect in Plaintiff's vehicle triggered fault code U1510.

89.     On information and belief, this code is identified on the OBDII Summaries that Defendant submitted to CARB as part of the certification process and caused the MIL to illuminate. This fault code directly correlates with increased emissions, per the OBDII Summaries, as explained above.

90.     Using diagnostics, Defendant identified a specific component that correlates with the OBDII fault codes, namely, a defective bumper shutter.  Therefore, the bumper shutter is an emissions-related component, as confirmed by the OBDII system, and is required to be covered under the California Emissions Warranty.

**THE BUMPER SHUTTER IS A HIGH-PRICED WARRANTED PART**

91.     As part of the certification process for a vehicle, the manufacturer determines which parts it considers to be "emissions parts" and submits a list of those parts to CARB. Section 2037(c). At the same time, the manufacturer also identifies the parts from the emissions parts list that the manufacturer has determined, based on the cost calculation set forth in the CCR, exceeds the cost limit and therefore are "high-priced" parts entitled to extended 7- year/70,000- mile coverage.

92.     California Code of Regulations Section 2037(c)(1) states that in calculating whether an individual replacement cost at the time of certification exceeds the cost limit, "the replacement cost shall be the retail cost to a vehicle owner and include the cost of the part, labor, and standard diagnosis." Similarly, Section 2037(c)(2) states that "the replacement cost shall be the retail cost to a vehicle owner and include the cost of the part, labor, and standard diagnosis."

93.     Although GM's warranty book indicates that grill shutters are covered under the California Emissions Warranty as emissions-related parts, the warranty book does not identify the grill shutters as covered for 7 years or 70,000 miles. Specifically, the warranty book states that "If

an emission-related part listed in this booklet specially noted with coverage for 7 years or 70,000 miles is defective, GM will repair or replace it. This is your Long-term Emission Control Systems Defects Warranty."  Further, the warranty book states that "Certain parts may be covered beyond these warranties if shown with asterisk(s) as follows: (*) 7 years/70,000 miles, whichever comes first, California Emission Control System Warranty coverage."

94.   The grill shutters are not identified with an asterisk or otherwise identified as parts covered for 7 years/70,000 miles, indicating that GM has failed to classify the grill shutters in the Class Vehicles as high-priced warranty parts.  This is because GM either has failed to conduct any high-price analysis for the grill shutters in the Class Vehicles or because GM has failed to conduct a proper high-priced analysis based on the customer pay rate relating to the parts and labor for diagnosing and repairing the grill shutters (and all emissions-related parts) in all Class Vehicles. As alleged above, on information and belief, GM does not use, and has never used, the retail labor cost i.e., the number of labor hours that the customer pays for the repair ("customer pay"). Instead, GM incorrectly uses the number of hours that the manufacturer pays its dealers to perform the repairs under warranty ("warranty pay"). GM is using the wrong standard and, in so doing, is failing to the comply with the express terms of the CCR and has miscalculated the high-price calculation.

95.   On information and belief, all of the Class Vehicles contain grill shutters, and all the grill shutters installed in all Class Vehicles are high-priced warranty parts when the proper high-priced analysis is performed under Section 2037(c) using the customer pay rate.

96.   All of the Class Vehicles are equipped with the same grill shutters, and all of the Class Vehicles have the same repair procedure for diagnosing and replacing defective grill shutters.

97.   The high-cost threshold for 2017 is $600.00, the high-cost threshold for 2018 is $610.00 and the high-cost threshold for 2019 is $620.00. The cost to replace the grill shutters is $902.21, plus tax, as evidenced by the fact that on February 21, 2023, Plaintiff took Plaintiff's Vehicle to Dublin Buick GMC, a factory authorized repair facility, and paid $902.21 for the diagnosis and replacement of defective grill shutters. Although the parts and labor cost to diagnose and replace defective grill shutters may have increased from 2017 to February 2023, the cost did

not go up by 50%, from $600 to $900. As such, the grill shutters installed in the Class Vehicles are high-cost parts, because the parts and labor cost to diagnose and repair these parts exceed the high-cost threshold.

98.     The grill shutter is only one example of Defendant's failure to properly cover parts under the California Emissions Warranty as high-priced for 7 years or 70,000 miles.  As alleged further herein, Plaintiff specifically seeks injunctive and declaratory relief to correct, *inter alia*, Defendant's systemic failure to apply the correct standard for performing the high-priced analysis for all emissions-related parts, not just the grill shutters, that should properly be designated as high-priced parts in GM vehicles, including the Class Vehicles.

**ALLEGATIONS REGARDING EQUITABLE RELIEF**

**Plaintiff is Entitled to Equitable Relief**

99.     Plaintiff alleges a UCL claim only, and the remedies under the UCL are limited to restitution and injunctive relief and do not include damages. Plaintiff does not allege a claim that provides for damages and does not seek damages.

100.     Equitable relief is necessary and appropriate because the harm suffered by Plaintiff and members of the Classes and perpetrated by Defendant is not adequately compensable with damages, and damages are not fully adequate to make Plaintiff and the Classes whole.

101.     Damages are inadequate to compensate for the harms caused to Plaintiff and the Classes due to Defendant's violation, and continuing violation, of the California Emissions Warranty.  The entire purpose of the California Emissions Warranty is to protect the environment. The California Emissions Warranty was enacted by the State of California to restrict harmful greenhouse gas emissions from gasoline and hybrid gasoline engines. The fundamental purpose of the emissions requirements is to reduce emissions, limit fuel consumption and increase fuel efficiency, by forcing manufacturers to repair and/or replace failed emissions-related vehicle components under warranty, thereby decreasing greenhouse gas emissions, including carbon dioxide emissions.

102.     Indeed, motor vehicle use is the single greatest source of U.S. air pollution and is the

cause of more air pollution than any other human activity. (Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990 (1991) 21 Envtl. L. 1947, 1949). Many of these pollutants consist of hydrocarbons and nitrous oxides which react to form photochemical oxidants in the atmosphere. The most notorious of these photochemical oxidants is ozone – the primary component of urban smog. (California Air Resources Bd., Staff Report: Proposed Regulations for Low-Emission Vehicles and Clean Fuels (Aug. 13, 1990) at p. 3). Cars also produce nearly two-thirds of all carbon dioxide emissions. Carbon dioxide content in the atmosphere is closely linked to global temperature because the temperature of the Earth is primarily determined by the balance between its absorption of energy from the Sun, and the reflection of a portion of this energy back into space. Carbon dioxide – a greenhouse gas – traps the energy and heat which would have otherwise escaped back into space, and re-emits it, causing the warming of our atmosphere. This process is known as the "greenhouse effect."

103.    Therefore, the State of California highly regulates emissions from gasoline and hybrid gasoline engines, specifically greenhouse gas emissions. In September 1990, pursuant to its broad authority to regulate and reduce environmentally harmful vehicle emissions under Health and Safety Code §§ 43013(a) and 43205, CARB submitted, and the Legislature adopted, California Code of Regulation §§ 2035, *et seq.*, which requires all manufacturers to provide a statutorily compliant emissions warranty to all vehicles distributed and registered in California.

104.    In September 2004, CARB approved the "Pavley" Greenhouse Gas Regulations to control greenhouse gas emissions from new LEV II vehicles beginning with the 2009 model year. These Greenhouse Gas Regulations added four greenhouse gas air contaminants to the vehicular criteria and toxic air contaminant emissions that California was already carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and hydrofluorocarbons (air conditioner refrigerants).

105.    The State and federal government have specifically focused on regulating greenhouse gas emissions, including carbon dioxide emissions. If a gas vehicle has a defect which increases fuel consumption, that defect increases carbon dioxide emissions.

106.    Notwithstanding State and federal regulations designed to protect our air,

monitoring shows that over 90 percent of Californians breathe unhealthy levels of one or more air pollutants during some part of the year. Despite CARB's best efforts, in 2020, "there were 157 bad air days for ozone pollution—the invisible, lung-searing gas in smog—across the vast, coast-to-mountains basin spanning Los Angeles, Orange, Riverside and San Bernardino counties. That's the most days above the federal health standard since 1997." (Barboza, Tony (Dec. 6, 2020) L.A. Began 2020 With A Clean-Air Streak but Ended with Its Worst Smog in Decades, Los Angeles Times [https://www.latimes.com/4alifornia/story/2020-12-06/2020-laair-quality-southern-california-pollution-analysis].) One of the reasons that our environment is in such a state of crisis is that corporations are not following our very thoroughly formulated rules.

107.    Breathing polluted and unhealthy air have health impacts to Plaintiff personally and to members of the Classes. The inhalation of polluted air can cause or exacerbate respiratory problems such as asthma, bronchitis, and other chronic obstructive pulmonary diseases (COPD). Fine particulate matter (PM2.5) and ground-level ozone, which can be formed in part due to greenhouse gas emissions, can penetrate deep into the lung tissue and cause inflammation and damage.

108.    Long-term exposure to air pollution has been linked to an increased risk of heart disease, stroke, and other cardiovascular problems. This is likely due to the inflammatory response triggered by pollutants in the lungs, which can affect the cardiovascular system. Studies have shown a link between long-term exposure to air pollution and premature death due to respiratory and cardiovascular disease.

109.    Emerging research suggests that air pollution affects the brain, contributing to neurodevelopmental issues in children and neurodegenerative diseases such as Alzheimer's and Parkinson's in adults. Certain pollutants in the air, particularly fine and ultrafine particulate matter, have been classified as carcinogens by the World Health Organization. Long-term exposure increases the risk of lung cancer and other types of cancer. Some studies have shown associations between exposure to air pollution and mental health issues, including depression and anxiety.

110.    Greenhouse gas emissions also contribute to climate change, which can indirectly

1    impact health through extreme weather events, increased heat-related illness, shifts in disease

2    vector distribution, and threats to food and water supply.

3        111.    The environmental harm suffered by Plaintiff and the Classes can never be fully

4    remedied through damages, and monetary damages will not make Plaintiff or the putative Class

5    whole.  Money damages will not stop the environmental harm experienced by Plaintiff personally,

6    and members of the Classes, including breathing polluted and unhealthy air which subjects them to

7    the health risks identified herein, as a result of Defendant's violation of the emissions laws. This

8    degradation of air quality and environmental harm as a consequence of Defendant's unlawful

9    conduct, which Plaintiff personally, and members of the Classes suffer from, requires injunctive

10   relief. Indeed, environmental injury, by its nature, can seldom be adequately remedied by money

11   damages and is often permanent or at least of long duration, i.e., irreparable.  Damages for

12   environmental harm are inadequate to make Plaintiff and the Classes whole because they are

13   inherently uncertain, incomplete, and difficult or impossible to calculate.

14       112.    Accordingly, this case is fundamentally different from other UCL cases involving

15   defective products or false advertising. Here, money damages will not fix the environmental harm

16   experienced by Plaintiff and the Classes as a result due of Defendant's violation of the emissions

17   laws, which requires equitable relief.

18       113.    Further, GM and other car manufacturers should not be able to shirk their legal

19   responsibilities to Plaintiff and the Classes simply by paying damages. Simply paying off

20   consumers undermines the entire purpose of the California Emissions Warranty and will leave

21   Defendant in the position of being able to continue to violate the law and increase harmful vehicle

22   emissions by just paying damages. Ironically, this result will leave Plaintiff and members of the

23   Classes in an even worse position than by simply receiving monetary compensation alone.

24       114.    Further, as set forth below, the prospect of paying damages is insufficient to prevent

25   Defendant from engaging, and continuing to engage, in the alleged unlaw conduct. Money damages

26   are an inadequate remedy for future harm, as they will not prevent Defendant from continuing the

27   alleged wrong practice. Damages for past conduct is not likely to dissuade Defendant from

28

continuing its unlawful behavior in the future. Equitable relief in the form of an injunction is necessary to compel Defendant to comply with the Regulations.

115.   Further, equitable relief is required because damages alone will not be sufficient for Members of the Classes to identify all parts whose defects result in fault codes identified in the OBD2 Summaries being triggered and all parts that should be covered for 7 years or 70,000 miles based upon a high-priced analysis that complies with the Regulations. Only Defendant has done the analysis and knows the fault code logic that would allow for identification of all required fault codes to CARB, all parts that give rise to those fault codes so that those parts can be identified and properly covered under the California Emissions Warranty and of those parts, all parts that should be covered as high-priced parts covered for 7 years or 70,000 miles. In effect, Plaintiff's request for equitable relief is the only way to get Defendant to do what it is required to do.

116.   The CARB Declaration further supports Plaintiff's claim for equitable relief.  The CARB Declaration sets forth CARB's interpretation of certain of the foregoing CCR provisions and the standard to use in determining whether an emission-related part is also high-priced. Defendant has an obligation under the California Emissions Warranty to identify all emissions-related vehicle components for which there should be warranty coverage. As a custom and practice, Defendant has interpreted this obligation too narrowly, resulting in Defendant wrongfully failing to identify vehicle components as high-priced emissions-related vehicle components under the California Emissions Warranty.

117.   Moreover, payment of damages does not ensure that the high-priced emissions parts will actually be repaired. That result will only be ensured by forcing Defendant to cover the repair under the California Emissions Warranty as required.

118.   Accordingly, the equitable relief requested would go beyond any damages remedy available to Plaintiff and the Classes, and damages would not fully remedy the injury to Plaintiff and the Classes.

**Plaintiff is Entitled to Restitution**

119.    In addition to the foregoing allegations, Plaintiff is entitled to restitution as an equitable remedy to recover out of pocket costs. Restitution is the only remedy provided by the UCL for recovering out of pocket costs, and Plaintiff does not allege another claim for which damages are provided.

120.    Further, restitution and damages are two distinct remedies that serve different purposes. The purpose of restitution is to restore Plaintiff and the Classes to their pre-harm position by requiring Defendant to return money (in this case, out of pocket costs) that was taken or lost as a result of Defendant's actions. The purpose of damages, on the other hand, which is not sought here, is to compensate for the harm suffered. The recovery of out-of-pocket expenses is restitution, not damages.

121.    Stated differently, restitution and damages are two separate legal concepts designed to address different forms of harm. Damages are a form of compensation awarded to a party who has suffered a loss or injury due to the wrongful actions of another party. The purpose of damages is to place the injured party, as much as possible, back to the position he would have been in if the harm had not occurred. Damages can be compensatory (intended to compensate the injured party for loss or injury) or punitive (intended to punish the wrongdoer).  Restitution, on the other hand, is a remedy used to restore the injured party to the position he was in before the wrongful act occurred, by making the wrongdoer disgorge benefits received as a result of its wrongs.  The purpose of restitution is not to compensate the injured party for a loss, but rather to prevent the wrongdoer from profiting from its wrongful act.  Since the remedy of restitution compensates for a different harm, the legal remedy of damages is inadequate.

122.    Further, restitution would be more certain, prompt or efficient than any legal remedy because there is an inherent limitation of the legal remedy for monetary damages in this case that renders it inadequate.  Under the UCL, Plaintiff may state a claim merely by showing that Defendant's practice violated the unfair or unlawful prongs of the UCL, as Plaintiff alleges here, without having to plead or prove any elements of fraud.  A claim for damages under a consumer claim (for example, under the CLRA), would require Plaintiff to prove reliance, knowledge and/or

intent -- elements that Plaintiff is *not* required to show to establish a claim under the unlawful or unfair prongs of the UCL, which are the only claims asserted by Plaintiff in this action. (Plaintiff does not assert a claim for fraud.)   However, to prevail in this case under the UCL, Plaintiff need only show that Defendant's conduct is unlawful or unfair.  Accordingly, there is a lack of an alternative remedy at law because the elements of Plaintiff's legal claims require proof of conduct beyond that which must be shown to establish liability under the UCL, and Plaintiff lacks an adequate remedy at law that is as "equally prompt and certain" as Plaintiff's equitable claims.

123.    Restitution also is more prompt than other legal remedies in this case because it would not require extensive legal proceedings or expert testimony. The Court could order restitution based on simple evidence of what was taken or lost, which can result in a faster resolution of the case.

124.    Indeed, restitution under the UCL is more prompt and more efficient because it can awarded through a bench trial, which is more efficient than a jury trial.  There are several efficiencies of a bench trial over a jury trial, including that the court may allow more flexibility on the start and end times each day with minimal breaks, whereas a jury trial requires lengthy breaks and a more structured daily schedule; at a bench trial, the court may permit the parties to dispense with verbal opening and closing statements entirely, and to instead provide the court with written submissions; and the parties may argue evidentiary disputes and other trial-related motions on the record in open court, rather than requiring the court and counsel to hold sidebars on issues that must be argued out of the jury's earshot.  Onerous and time-consuming jury related tasks are also avoided, such as drafting *voir dire* questions, *voir dire* motion practice, and conducting the jury selection process itself, and the court can reserve evidentiary and legal issues for its final decision and avoid slowing down the trial, instead of having to decide issues in real time to submit the case to the jury. A significant procedural difference between a bench trial and a jury trial is that a court may elect to reserve a decision when evidentiary challenges occur in a bench trial, rather than rule on them when they arise, as is typical in a jury trial.  Reserving judgment on evidentiary objections helps the trial proceed more efficiently and affords the court time for a more careful review of the

proposed evidence before issuing a final decision. Many judges also dispense with opening statements in bench trials because of the extensive pretrial submissions that they often require, which further creates efficiencies over jury trials.

125.    Further, in UCL cases, restitution seeks to restore money (i.e., out of pocket costs) that was wrongfully obtained by Defendant. This amount can be calculated with relative certainty, making the amount of restitution more predictable than other types of relief, such as damages. The process of seeking damages also creates complications that make that remedy inadequate compared to straightforward restitution.  Whereas the court could order restitution based on simple, easily quantified evidence of what was taken or lost, which results in faster and more efficient resolution of the case, damages calculations can be more speculative, requiring extensive expert testimony and often additional legal proceedings.

126.    In addition, restitution is more efficient than other types of relief because it does not require ongoing Court supervision or enforcement. Once an order for restitution has been issued, Defendant is generally required to pay promptly or face additional legal consequences. This can make the process more efficient than other types of relief, such as an award of damages that may require ongoing monitoring and enforcement.

127.    Plaintiff's claim for monetary relief is secondary to Plaintiff's primary goal of obtaining declaratory relief and/or requiring Defendant to properly and fully comply with the California Emissions Warranty, as described herein.

**Plaintiff is Entitled to Injunctive Relief**

128.    Plaintiff also is entitled to injunctive and/or declaratory relief as an equitable remedy. Plaintiff's primary goal on behalf of the Classes is to obtain injunctive relief requiring GM to comply with the California Emissions Warranty and declaratory relief with respect to the proper interpretation of the California Emissions Warranty and GM's obligations pursuant to the CCRs and the California Emissions Warranty.  Even in the absence of possible monetary recovery, Plaintiff would bring this action to obtain the injunctive and declaratory relief sought.

129.    Plaintiff seeks an injunction and/or declaration that Defendant's ongoing and

continuing practices as alleged herein do not comply with the CCRs and with the California Emissions Warranty laws and enjoining and/or correcting such practices, including that, *inter alia*: Defendant use the correct standards for identifying "emission-related" parts and/or "high-priced warranty parts" under the California Emissions Warranty, including, systemically using the customer pay rate,  instead of the warranty pay rate, to perform the high-priced parts analysis, and thereby comprehensively and correctly identify all high-priced emissions parts, including, but limited to the grill shutter, that should properly be covered under the California Emissions Warranty.

130.    The injunctive relief that Plaintiff requests is prospective in nature and is the only adequate remedy to prevent the future harm that will be caused by Defendant's continuation of the unfair and unlawful conduct alleged herein.

131.    As set forth in detail above, Plaintiff lacks an adequate remedy at law for Plaintiff's request for future injunctive relief. The prospect of paying money is insufficient to prevent Defendant from engaging, and continuing to engage, in the alleged unlawful conduct.  Money damages are an inadequate remedy for future harm, as they will not prevent Defendant from continuing the alleged wrongful practice. Damages or monetary relief are particularly inadequate to address ongoing and future environmental harm to Plaintiff personally, and to the Classes, caused by increased regulated emissions due to violation of the California Emissions Warranty, and environmental injury, by its nature, cannot be adequately remedied by money damages. Restitution for past conduct is not likely to dissuade Defendant from continuing its unlawful behavior in the future.  Moreover, payment of restitution does not ensure that the high-priced emissions parts will actually be repaired. That result will only be ensured by forcing Defendant to cover the repair under the California Emissions Warranty as required.  Moreover, future money damages that may be suffered by the Plaintiff and other consumers cannot be proven with certainty.

132.    Further, due to the extremely technical nuances of the CCR, due to a total lack of knowledge on the part of consumers with regard to how to determine if a part is a high-priced emissions-related warranted part, due to a total lack of knowledge on the part of consumers relating

to the information necessary in order to calculate if a part is high-priced (because the analysis is supposed to use a historical hourly rate in the highest cost metropolitan area in California, use a formula based upon the consumer price index, use a historical part cost, etc.), it is simply not realistic that consumers will have any awareness of Defendant's wrongful conduct. Without an injunction to, *inter alia*, compel Defendant to comply with the requirements of the California Emissions Warranty as alleged herein and specifically to cover the grill shutter under the California Emissions Warranty as high-priced, thus covered for 7 years or 70,000 miles, Plaintiff and consumers generally will not be able to compel Defendant to cover the repair under warranty.

133.    There is no way that the Court can ensure that Defendant will properly cover the grill shutter under warranty, absent injunctive relief.   Indeed, one element of the requested injunctive relief is that Defendant inform and notify members of the Classes, via inserts to the warranty books or otherwise, and at the time of presentment for repair or replacement of the grill shutter at authorized service centers, that the grill shutter is an emissions-related part covered under the California Emissions Warranty as high-priced, thus covered for 7 years or 70,000 miles. Absent the requested injunctive relief, members of the Classes do not, and will not, know that the grill shutter is a covered part for 7 years or 70,000 miles (even if Defendant, in fact, may be covering the part under warranty).  As a result, members of the Classes will not take their cars to Defendant for a warranted repair on the grill shutter because they do not know that the diagnosis and repair or replacement of the grill shutter is covered under the California Emissions Warranty, and, when they do take their vehicles for repairs to Defendant or elsewhere, they will not know that the diagnosis and repair or replacement for the grill shutter, in fact, is covered under the California Emissions Warranty.

134.    Defendant's decision to not warrant the shutter grill when it is required to do so under California Emissions Warranty also causes future environmental harm because some Class members will not repair defective shutter grill if the repair is not covered under warranty, resulting in continuing and irreparable damage to the environment due to Defendant's failure to cover the part.  Further, as a result of Defendant's continuing failure to properly cover parts under the

1   California Emissions Warranty as high-priced, thus covered for 7 years or 70,000 miles, consumers

2   are continuing to overpay for vehicles with a non-complaint California Emissions Warranty.  An

3   injunction is necessary to prevent this continuing and future misconduct.

4   **Additional Allegations Regarding Plaintiff's Standing for Injunctive Relief**

5   135.    Plaintiff is entitled to seek future injunctive relief.  Plaintiff's threat of injury is

6   actual and imminent, not conjectural or hypothetical, and there is a sufficient likelihood that

7   Plaintiff personally will again be wronged in a similar way.

8   136.    As alleged above, the environmental harm caused by Defendant's misconduct is

9   not only imminent but continuous and ongoing, and will not change absent the requested injunctive

10  relief, and damages will not prevent Defendant from continuing its alleged wrongful practices. By

11  not covering emissions-related repairs under the California Emissions Warranty, Defendant is

12  continuing to flout the requirements of the California Emissions Warranty, resulting in

13  deteriorating air quality that injures, and continues to injure, Plaintiff and members of the Classes.

14  137.    Whether or not Plaintiff still owns his car (he does) and whether or not the warranty

15  still applies to the vehicle (it does), Plaintiff has alleged that when a bumper shutter grill fails to

16  work properly, it increases regulated emissions regulated by the State of California; that  the grill

17  shutters in the Class Vehicles are defective and will continue to fail; that Defendant is not covering

18  them under warranty; and that Plaintiff is continuing to be harmed by the harmful greenhouse gas

19  emissions emitted in his environment by the defective parts.   As Defendant is not covering the grill

20  shutters gaskets under Warranty, Plaintiff is continuing to be harmed by the harmful greenhouse

21  gas emissions emitted in his environment by the defective parts in other Class Vehicles that

22  Defendant refuses to repair under warranty.   Plaintiff will personally suffer as a result of the harm

23  to the environment caused by Defendant's continued failure to cover the grill shutter and other

24  parts under the California Emissions Warranty, because when these parts fail and are not repaired,

25  they continue to harm the environment and pollute the air Plaintiff and Class members breathe.

26  138.    This harm is not conjectural or hypothetical. The harm described herein is precisely

27  why the Regulations relating to the California Emissions Warranty were enacted and is the type of

28

1  direct harm that the California Emissions Warranty seeks to prevent.

2          139.    Indeed, the entire purpose and intent of the California Emissions Warranty is to

3  protect consumers and residents of the State of California, including Plaintiff, from harmful

4  pollutants emitted from defective emissions-related parts, with the goal that these parts are replaced

5  or repaired by the manufacturer and do not continue to harm the air Plaintiff breathes in his

6  environment. The California Emissions Warranty was enacted by the State of California to restrict

7  harmful greenhouse gas emissions from gasoline and hybrid gasoline engines. The fundamental

8  purpose of the emissions requirements is to reduce emissions, limit fuel consumption and increase

9  fuel efficiency, by forcing manufacturers to repair and/or replace failed emissions-related vehicle

10 components under warranty, thereby decreasing greenhouse gas emissions, including carbon

11 dioxide emissions in the environment Plaintiff lives and breathes in. The goal of CARB's

12 emissions regulations is to directly address these health risks and provide tangible public health

13 benefits for California residents by meeting the State's health based ambient air quality standards

14 across California and minimizing the negative health effects of vehicle emissions in California and

15 in the State's communities.  (Plaintiff's community, in Dublin, California, is particularly influenced

16 by the air quality of the broader San Joaquin Valley. The Valley experiences air quality issues

17 because of its topography, which traps pollutants, especially during periods of high pressure in the

18 summertime or in the winter when there is an inversion layer.)

19          140.    Breathing polluted and unhealthy air is an actual harm that impacts Plaintiff

20 personally and directly.  These risks are well known.  Inhalation of polluted air causes respiratory

21 problems such as asthma, bronchitis, and other chronic obstructive pulmonary diseases (COPD).

22 Fine particulate matter (PM2.5) and ground-level ozone, which is formed in part due to greenhouse

23 gas emissions, penetrates deep into the lung tissue and causes inflammation and damage. Exposure

24 to air pollution also is linked to heart disease, stroke, and other cardiovascular problems due to the

25 inflammatory response triggered by pollutants in the lungs, which affects the cardiovascular

26 system. There is also a link between exposure to air pollution and premature death due to

27 respiratory and cardiovascular disease.  Further, air pollution affects the brain, contributing to

28

neurodevelopmental issue and neurodegenerative diseases such as Alzheimer's and Parkinson's. Pollutants in the air, such as fine and ultrafine particulate matter, which are emitted by the defective vehicle parts Defendant refuses to cover under warranty, have been classified as carcinogens by the World Health Organization. Exposure causes lung cancer and other types of cancer.  Plaintiff is personally and directly at risk of these imminent and significant health issues as a result of Defendant's conduct alleged herein, which cannot be avoided without injunctive relief.

141.   The degradation of air quality and environmental harm suffered by Plaintiff as a consequence of Defendant's misconduct requires injunctive relief, and Plaintiff is continuing to be personally harmed by the harmful greenhouse gas emissions emitted in his environment by the defective grill shutters, not only from his particular vehicle, but from all Class vehicles with the defective parts that Defendant is failing to cover under warranty.  Accordingly, this risk of harm to Plaintiff applies, whether or not Plaintiff still owns his particular vehicle and whether or not the warranty on his particular vehicle has expired.

142.   An injunction will ensure that Plaintiff is not harmed by the effects of Defendant's continuing, ongoing and future failure to repair defective grill shutters under warranty. Unless enjoined, the harm to Plaintiff personally from the emissions emitted from Defendant's defective grill shutters will continue.

143.   Plaintiff is unable to rely on Defendant's application certification submitted to CARB in order to determine if the grill shutter or any other particular part for a particular vehicle is covered under the California Emissions Warranty.  Indeed, as alleged above, the point of this lawsuit is that Defendant unlawfully *failed to properly cover* emissions-related parts, including the grill shutter, under warranty, or to identify them as emissions-related parts in the certifications Defendant submitted to CARB.  As Plaintiff has alleged, the certification information that Defendant submitted to CARB is incomplete and unreliable.

144.   Moreover, Plaintiff could not make a determination, by reasonable diligence that, any particular part that is not currently covered under the California Emissions Warranty, should, in fact, properly be covered under warranty.  It is impractical, and well beyond reasonable diligence,

1   to require Plaintiff or any other member of the Classes to examine Defendant's application

2   certification submitted to CARB before seeking a repair in order to ferret out whether a particular

3   part for a particular vehicle should have been properly covered under the California Emissions

4   Warranty.

5         145.    Further, there is a sufficient likelihood that Plaintiff and members of the Classes will

6   again be wronged in a similar way.  To the extent that the alleged defect in the grill shutter is the

7   result of a design-related defect or a systemic defect in materials or workmanship, the defect will

8   continue to manifest in Plaintiff's vehicle and in all Class Vehicles, and all Class Vehicles will

9   need repair or replacement of the bumper shutter within the 7-year and 70,000-mile high-cost

10  California Emissions Warranty period.  This is not conjecture or a hypothetical concern, especially

11  of the defect is design related. However, at this time, Defendant is refusing to provide 7-year

12  70,000-mile California Emissions Warranty coverage for grill shutters.  When a grill shutter fails to

13  work properly as described herein, it increases regulated emissions.

14        146.    Further, as alleged above, Plaintiff's request for injunctive or declaratory relief is

15  not limited to one particular part, as Plaintiff seeks to remedy a systemic misconduct that affects all

16  emissions-related parts in GM vehicles, namely, Defendant's systemic failure to use the correct

17  standard for performing the high-priced analysis with respect to emissions-related parts, thereby

18  failing to sufficiently cover parts under the California Emissions Warranty. There is a sufficient

19  likelihood that Plaintiff and members of the Classes will again be wronged in a similar way

20  because Defendant is systemically continuing to fail to properly identify all parts that should

21  properly and correctly be covered under the California Emissions Warranty as high-priced

22  emissions-related parts. These parts include the parts identified in the "OBDII Summaries" and

23  parts that increase regulated emissions that are not currently covered under Defendant's California

24  Emissions Warranty as high-priced, due to GM's failure to conduct a high-priced analysis that

25  complies with the Regulations.  As Plaintiff alleges, the grill shutter is only one example of

26  Defendant's failure to properly cover parts under the California Emissions Warranty as high-

27  priced, thus covered for 7 years or 70,000 miles, and Plaintiff seeks injunctive relief to systemically

28

1   correct Defendant's failure to apply the correct standard for performing the high-priced analysis as

2   a matter of corporate practice generally, not just for the grill shutters.

3        147.    Further, Plaintiff faces a threat of imminent or actual harm by not being able to rely

4   on Defendant's representations regarding California Emissions Warranty coverage in the future.

5   Plaintiff is in the market to purchase another GM vehicle and would purchase Defendant's product

6   in the future; however, because Plaintiff is not able to rely on Defendant's California Emissions

7   Warranty in the future, Plaintiff will not purchase another of Defendant's vehicles, although

8   Plaintiff would want to.  Absent injunctive relief, Plaintiff will not know whether it makes sense to

9   spend money on another Defendant vehicle in the future on account of Defendant's noncompliance

10  with the California Emissions Warranty, and Plaintiff and the members of the Classes will have to

11  deal with the same sort of warranty coverage issues again. Plaintiff is unable to purchase

12  Defendant's product again with confidence that Plaintiff can rely on Defendant's adherence to the

13  California Emissions Warranty in the future.

14       148.    Further, if Plaintiff or members of the Classes purchase another Defendant vehicle

15  in the future, they might reasonably, but incorrectly, assume that Defendant complied with all the

16  requirements of the California Emissions Warranty, when it did not.  Due to Defendant's

17  continuing conduct, Plaintiff is unable to trust Defendant's California Emissions Warranty claims,

18  is unable to rely on Defendant to properly identify parts that should properly be covered under the

19  California Emissions Warranty and has no way to determine whether Defendant's warranty

20  representations are thorough or complete.  Thus, absent injunctive relief, Plaintiff will have no way

21  of knowing now, or in the future, whether Defendant, in fact, is complying with the California

22  Emissions Warranty as required.  To the extent that Plaintiff does not purchase another of

23  Defendant's vehicles, it will be because, at least in part, Plaintiff is unable to rely on Defendant to

24  comply with the requirements of the California Emissions Warranty.

25       149.    Further, Plaintiff is unable to rely on Defendant's application certification submitted

26  to CARB in order to determine if the grill shutter or any other particular part for a particular vehicle

27  is covered under the California Emissions Warranty.  Indeed, the point of this lawsuit is that

28

Defendant unlawfully *failed to properly cover* emissions-related parts, including the grill shutter, under warranty or to identify them as emissions-related parts in the certifications Defendants submitted to CARB.  As Plaintiff has alleged, the certification information is incomplete.

150.    Moreover, Plaintiff and Class members are not required to determine prior to presentment for repair or replacement that any particular part should, in fact, properly be covered under the California Emissions Warranty, nor could they even make such a determination by reasonable diligence.  It is impractical, and well beyond reasonable diligence, to require Plaintiff or any other member of the Classes to examine Defendant's application certification submitted to CARB before seeking a repair in order to ferret out whether a particular part for a particular vehicle should have been covered under the California Emissions Warranty.

151.    As described above, the process of determining whether a part should be covered involves a detailed analysis of the CARB Regulations and Defendant's OBDII fault code system. This a cumbersome and complicated process requiring more than layman's expertise.  Prior to the retention of counsel and without third-party experts, Plaintiff and Class members lack the necessary expertise to analyze submissions to CARB or to even identify the Class Vehicles that should be subject to the warranty. Indeed, the entire purpose of the certification process is that consumers ultimately can rely on the representations made by car manufacturers as to which parts they are covering under the California Emissions Warranty as required by the Regulations. Even if Plaintiff could conduct such an analysis, it would not confirm that Defendant would agree that the disputed part, in fact, should be covered.

152.    Further, as Plaintiff has alleged, Plaintiff's specific request for injunctive relief (as opposed to the request for restitution) is not limited to one particular part, as Plaintiff seeks to remedy a *systemic misconduct* that affects all emissions-related parts in GM vehicles, namely, Defendant's systemic failure to use the correct standard to identify emissions-related parts, thereby failing to sufficiently cover parts under the California Emissions Warranty, not just the grill shutter.

153.    As alleged herein above, Defendant's California Emissions Warranty for the Class Vehicles identifies only a handful of emissions parts that Defendant contends qualify for California

Emissions Warranty coverage.  By narrowly self-defining the parts that are required to be covered under the California Emissions Warranty, Defendant is able to reduce the amount of money that it spends on warranty-related repairs, knowing that most if not all dealerships or consumers will not investigate or understand what components should actually and correctly be covered under the California Emissions Warranty as required by the California Code of Regulations.

154.   As Plaintiff has alleged above, the grill shutter is only one example of Defendant's failure to properly cover parts under the California Emissions Warranty as emissions-related parts, and as further alleged below, Plaintiff's request for injunctive relief specifically includes an order that GM be required, on a going forward basis, to use the proper standard for determining whether a part is "emissions-related" under the California Emissions Warranty and otherwise accurately and comprehensively apply the California Emissions Warranty in order to properly identify all other emission-related parts as defined herein that should be covered under the California Emissions Warranty. Plaintiff seeks to enjoin a systemic corporate practice generally, not just with respect to the grill shutter.

155.   Further, Plaintiff is in the market to purchase another GM vehicle and would purchase Defendant's product in the future; however, because Plaintiff is not able to rely on Defendant's California Emissions Warranty in the future, Plaintiff will not purchase another of Defendant's vehicles, although Plaintiff wants to.  Absent injunctive relief, Plaintiff will not know whether it makes sense to spend money on another Defendant vehicle in the future on account of Defendant's noncompliance with the California Emissions Warranty, and Plaintiff and the members of the Classes will have to deal with the same sort of warranty coverage issues again.

156.   Further, if Plaintiff or members of the Classes purchase another Defendant vehicle in the future, they might reasonably, but incorrectly, assume that Defendant complied with all the requirements of the California Emissions Warranty, when it did not.  As alleged above, Plaintiff is unable to rely on Defendant's application certification submitted to CARB in order to determine if the grill shutter or any other particular part for a particular vehicle is covered under the California Emissions Warranty.  Due to Defendant's continuing misconduct, Plaintiff is unable to trust

Defendant's California Emissions Warranty claims, is unable to rely on Defendant to properly identify parts that should properly be covered under the California Emissions Warranty and has no way to determine whether Defendant's warranty representations are thorough or complete. Therefore, Plaintiff is unable to purchase Defendant's product again with confidence that Plaintiff can rely on Defendant's adherence to the California Emissions Warranty in the future.

157.   Thus, absent injunctive relief, and for all the reasons alleged herein, Plaintiff will have no way of knowing now, or in the future, whether Defendant, in fact, is complying with the California Emissions Warranty as required.  To the extent that Plaintiff does not purchase another of Defendant's vehicles, it will be because, at least in part, Plaintiff is unable to rely on Defendant's compliance with the requirements of the California Emissions Warranty.

158.   For all of the foregoing reasons, Defendant's ongoing violations of the California Emissions Warranty and failure to cover the grill shutter under warranty pose a real, immediate, continuing and personal risk to Plaintiff such that he has Article III standing to be entitled to injunctive relief.

**Plaintiff is Entitled to Public Injunctive Relief**

159.   One form of injunctive relief provided under the UCL is "public injunctive relief." Accordingly, as Defendant's misconducts affects not only Class Members but primarily the general public, Plaintiff also seeks, in the alternative and/or as necessary and in Plaintiff's individual capacity, public injunctive relief for the benefit of the general public.

160.   Indeed, by definition, the injunctive relief provided by the UCL has as its primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public.

161.   Further, as alleged above, Plaintiff seeks to enjoin future violations of California's consumer protection statute, which by its very nature is relief oriented to, and for the benefit of, the general public. An injunction under the UCL is for the benefit of the general public and is designed to prevent further harm to the public at large.

162.   Moreover, as alleged herein, the entire purpose of the California Emissions Warranty is to protect the environment and the general public, not just Class Members. The

California Emissions Warranty was enacted by the State of California to restrict harmful greenhouse gas emissions from gasoline and hybrid gasoline engines. The fundamental purpose of the emissions requirements is to reduce emissions, limit fuel consumption and increase fuel efficiency, by forcing manufacturers to repair and/or replace failed emissions-related vehicle components under warranty, thereby decreasing greenhouse gas emissions, including carbon dioxide emissions, to the general public. The California Legislature, through the enactment of the California Emissions Warranty, has clearly indicated that the goal of limiting regulated emissions is for the benefit of the public in general and not just purchasers of specific automobiles.

163.    Defendant's misconduct is continuing, and Plaintiff's requested relief has the primary purpose and effect of protecting the public from Defendant's ongoing harm. All members of the public can become customers of Defendant at some time in the future, and even if they do not, this does not negate the fact that public injunctive relief will nevertheless offer benefits to the general public.

164.    To the extent required, Plaintiff further alleges that the environmental harm suffered by the public can never be fully remedied through damages, and monetary damages will not make Plaintiff or the public whole. Money damages will not stop the environmental harm experienced by the public as a result of Defendant's violation of the emissions laws, which requires public injunctive relief. Indeed, environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.

165.    In addition, the issues and claims alleged herein are matters of significant public interest and are likely to recur. The proper interpretation of a statute (in this case, a California Regulation), including adjudicating whether Defendant's conduct violates the UCL, unquestionably presents a matter of public interest, as Defendant is continuing to misinterpret the California Emissions Warranty, including Sections 2035 and 2037.

166.    Further, Defendant and other car manufacturers should not be able to shirk their legal responsibilities simply by paying money. Simply paying off consumers undermines the entire purpose of the California Emissions Warranty and will allow Defendant to continue violating the

law and subjecting the public to increased harmful vehicle emissions by just paying money.

167.    Accordingly, public injunctive relief is necessary and appropriate.

### PLAINTIFF SEEKS DECLARATORY RELIEF

168.    Plaintiff also seeks declaratory relief and judgment, including pursuant to applicable statutes, including CCP § 1062,  on behalf of the members of the Classes and/or in Plaintiff's individual capacity, declaring that Defendant's ongoing, future and/or past practices as alleged herein do not comply with the CCRs, including the California Emissions Warranty, and that *inter alia*: Defendant has used, and continues to use, the wrong or incorrect standards for identifying "high-priced warranty parts" under the California Emissions Warranty. An actual controversy has arisen and now exists between Plaintiff and Defendant with respect to the interpretation, implementation, and application of California Emissions Warranty, as alleged herein.

### CLASS ACTION ALLEGATIONS

169.    Plaintiff re-alleges and incorporates by reference each allegation set forth above.

170.    Except as to his claim for public injunctive relief, Plaintiff brings this action on his own behalf, and on behalf all those similarly situated as set forth in the Class definitions below (the Classes  and Subclasses are collectively referred to herein as "the Class"), as well as on behalf of all Class members similarly situated, pursuant to Federal Rules of Civil Procedure Rules 23(a), (b)(1), (2) and/or (3) and/or (c)(4).  This action seeks a remedy for relating to all GM vehicles equipped with grill shutters which should have been covered under the 7-year, 70,000-mile California Emissions Warranty as high-priced parts but for which coverage was denied due to GM failing to perform a high-priced analysis that complies with the California Emissions Warranty.

171.    Plaintiff reserves the right to redefine the Classes and Subclasses to add subclasses as appropriate based on further investigation, discovery, and specific theories of liability.

172.    This action seeks a remedy for relating to all GM vehicles equipped with grill shutters which should have been covered under the 7-year, 70,000-mile California Emissions Warranty as high-priced parts but for which coverage was denied due to GM failing to perform a

1  high-priced analysis that complies with the California Emissions Warranty.

2      173.    Defendant's California Emission Warranty applies to vehicles purchased and

3  registered in States which, in the year the vehicle was distributed, had adopted the California

4  Emissions Warranty, i.e., "Reg. 177 States" or "Section 177 States."

5      174.    On information and belief, GM's California Emission Warranty applies to vehicles

6  purchased and registered in California, Connecticut, Delaware, Maine, Maryland, Massachusetts,

7  New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, or Washington (i.e., "Reg.

8  177 States" or "Section 177 States," namely, States that have adopted California's Low-Emission

9  Vehicle (LEV) criteria pollutant and greenhouse gas (GHG) emission regulations and Zero

10  Emission Vehicle (ZEV) regulations under Section 177 of the Clean Air Act, 42 U.S.C. §7507).

11      175.    Defendant's emissions warranty representations arise out of California law that

12  Defendant must apply outside of California to the vehicles in Reg. 177 States.  Accordingly,

13  Defendant's conduct was specifically intended to have effects outside of California and was

14  specifically intended to apply to vehicles and members of the Classes in those States that

15  Defendant chose to include by the express terms of the California Emissions Warranty.

16      176.    Under these unique circumstances, California has a specific interest in regulating

17  conduct outside of California that specifically invokes California emissions requirements and

18  California emissions regulations and has an interest in preventing illegal practices that involve

19  breach of California Emissions Warranty law that Defendant has chosen to invoke outside of

20  California in the States covered by the Reg. 177 Class. As Defendant seeks to apply the California

21  Emission System Warranty to members of the Class and vehicles in the listed States outside of

22  California, members of the Classes in those States likewise should be included in a claim that seeks

23  to vindicate their rights under that same warranty in California and should have the ability to have

24  their rights under that warranty asserted in California and pursuant to California law.

25      177.    Defendant's own express application of the California Emissions Warranty

26  constitutes a sufficient connection between California and out-of-state potential Class members.

27  Further, Defendant's misconduct, namely, its failure to identify all emissions-related warranted

28

CLASS ACTION COMPLAINT

1  parts to CARB, a California regulator, occurred in California, and even out-of-state purchasers

2  were harmed by Defendants' conduct that occurred in California. Defendant failed to disclose, in

3  its submissions to CARB, the parts that are properly covered by the California Emissions Warranty,

4  including, but not limited to, grill shutters.

5         178.    As alleged herein, Defendant is solely responsible for selecting and identifying to

6  CARB all of the parts that should be classified as emissions warranted parts, and Defendant failed

7  to include grill shutters and other components. Californians and out-of-state potential Class

8  members in the additional States covered by the California Emissions Warranty suffered an

9  identical harm – they were forced to pay the costs of grill shutters diagnosis, repair, or replacement,

10  which should have been covered under the California Emissions Warranty, and were provided with

11  warranties which were less valuable than the warranties they were legally entitled to at the time

12  they purchased or leased their Class Vehicle. Under these unique circumstances, California has the

13  greater interest in applying California's consumer laws to enforce compliance with the California

14  Emissions Warranty than the other States have in using their consumer laws to enforce the same

15  Regulation. California has a specific interest in regulating conduct outside of California that

16  specifically invokes California emissions requirements and regulations, and California has an

17  interest in preventing illegal practices that involve breach of California emissions law that

18  Defendant has chosen to invoke outside of California in the specific States covered. California also

19  has a supreme interest in applying its own consumer protection laws in ensuring that the California

20  Emissions Warranty is properly interpreted and applied wherever Defendant has chosen to invoke

21  it.

22         179.    Under the facts of this specific case, the law of California should be applied because

23  California's interest would be more impaired if its consumer laws to enforce the California

24  Emissions Warranty were subordinated to consumer laws of the other States to which Defendant

25  has chosen to apply the requirements of the California Emissions Warranty. Other jurisdictions'

26  interests in applying their own consumer protection laws to their own residents do not strongly

27  outweigh the interest California has in applying its consumer protection laws to enforce the

28

1  California Emission Warranty with respect to the specific potential out-of-state members of the

2  Classes identified herein. Therefore, the Classes alleged herein include persons who purchased or

3  leased Class Vehicles that are registered in States other than California.

4        180.    There is sufficient similarity among all the Class Vehicles and Defendant's conduct

5  as defined herein in that, among other things, all of the vehicles in the proposed Classes are subject

6  to the same California Emissions Warranty and the same requirements that Defendant report all

7  emissions-related defects to CARB pursuant to the CCR.  Moreover, on information and belief, all

8  of grill shutters at issue have the same or similar part numbers and will trigger the same or similar

9  ONBDII fault codes.  Thus, Defendant has acted in a uniform manner with respect to all Class

10  Vehicles by failing to properly cover grill shutters in the Class Vehicles as required under the

11  California Emissions Warranty and as described herein.

12        181.    In sum, there are multiple clear nexuses between California and the Reg 177 States:

13  each state at issue chose to use California's Emissions Warranty law; Defendant chose to

14  incorporate California's emissions warranty into its warranty in other states; and Defendant

15  allegedly made misrepresentations to California's regulator, CARB. Further, there is no credible

16  contention that these other states would choose to apply their own consumer protection law in this

17  situation, given that they have already chosen to piggyback off California's consumer protection

18  law. California and the other states each have an interest in having California's law interpreted

19  correctly: their interests are not in tension, and even if they must be balanced, California's

20  outweighs the other states.

21        182.    General Motors, as one of the largest automakers in the world, has a strong interest

22  in ensuring its vehicles can be sold in California and other states that follow its lead on emissions

23  standards, and GM has been involved in lawsuits and lobbying efforts related to these standards.

24  For example, in 2020, for GM initially sided with the Trump administration in a lawsuit against

25  California's right to set its own emissions standards. General Motors initially sided with the Trump

26  administration in a legal battle over whether California should be allowed to set its own emissions

27  standards, which are more stringent than the federal regulations. The Trump administration argued

28

1   that only the federal government had the right to set such standards and sought to roll back the

2   stricter regulations put in place during the Obama administration. However, after President Joe

3   Biden was elected, GM reversed its stance and withdrew its support for the lawsuit, signaling a

4   commitment to work with California and the Biden administration on aggressive targets for

5   reducing greenhouse gas emissions.  GM purposefully directed its activities at California in

6   supporting California's more stringent emissions standards. Further, GM announced plans in 2020

7   to launch 30 new electric vehicles globally by 2025 and aspired to eliminate tailpipe emissions

8   from new light-duty vehicles by 2035, aligning with California's aggressive environmental goals.

9   GM also plans to collaborate with EVgo to triple the size of America's largest public fast-charging

10  network by adding more than 2,700 new fast chargers by the end of 2025. This network expansion

11  would help California and other states make the transition to electric vehicles and ultimately

12  decrease vehicle emissions.

13      183.    On information and belief, GM sells its vehicles through authorized dealerships in

14  California. These dealerships act as intermediaries between the company and the customers,

15  promoting and selling GM vehicles with reduced emissions within the.

16      184.    In addition, on information and belief, GM conducts marketing and advertising

17  campaigns targeted specifically at California consumers. This involves advertising in local media

18  outlets, sponsoring local events, and using targeted online advertising to reach potential customers

19  in the State.

20      185.    On information and belief, GM has installed grill shutters on the following gasoline

21  powered and hybrid vehicles (collectively the "Class Vehicles"): 2017-2019 Chevrolet Silverado,

22  2017-2019 GMC Sierra, 2017-2019 Chevrolet Suburban, 2017-2019 GMC Yukon and 2017-2019

23  Cadillac Escalade vehicles, all of which are distributed by GM.

24      186.    There is sufficient similarity among all the Class Vehicles and GM's conduct as

25  defined herein in that, among other things, all of the vehicles in the proposed Classes are subject to

26  the same California Emissions Warranty and the same requirements that GM report all emissions-

27  related defects to CARB pursuant to the CCR.  Further, on information and belief, the grill shutters

28

in all Class vehicles have the same or similar design and perform the same or similar function. GM has acted in a uniform manner with respect to all Class Vehicles by failing to properly cover grill shutters in the Class Vehicles as required under the California Emissions Warranty and as described herein.

187.    Accordingly, Plaintiff's proposed Classes and Subclasses consist of and are defined as follows:

**California Class and Subclass:**
All persons in the State of California who have been owners or lessees of Class Vehicles and whose grill shutters are not covered for 7 years or 70,000 miles (the "California Class").

All persons in the State of California who have been owners or lessees of Class Vehicles and who have paid for repairs and parts pertaining to defective grill shutters which occurred outside of the Class Vehicle's powertrain warranty period but prior to 7 years or 70,000 miles (the "California Out-of-Pocket Subclass").

**Reg. 177 Class and Subclass:**
All persons who have been owners or lessees of Class Vehicles in a State which, in the year their vehicle was distributed, had adopted the California Emissions Warranty (i.e., "Reg. 177 States" or "Section 177 States) and whose grill shutters are not covered for 7 years or 70,000 miles (the "Reg. 177 Class").

All persons who have been owners or lessees of Class Vehicles in a State which, in the year their vehicle was distributed, had adopted the California Emissions Warranty (i.e., "Reg. 177 States" or "Section 177 States) and who have paid for repairs and parts pertaining to defective grill shutters which occurred outside of the Class Vehicle's powertrain warranty period but prior to 7 years or 70,000 miles (the "Reg. 177 Out-of-Pocket Subclass").

188.    Plaintiff reserves the right to establish other classes and subclasses.

189.    There is a well-defined community of interest, and the class is readily ascertainable:

(a)    Numerosity: As required by Fed. R. Civ. P. 23(a)(1), the members of the Classes are so numerous that joinder of all Class members would be unfeasible and impractical, and the resolutions of their claims through the procedure of a class action will be of benefit to the Parties and the Court. The membership of the entire Class is unknown to Plaintiff at this time; however,

the Classes are estimated to be greater than one hundred (100) individuals and the identity of such membership is readily ascertainable by inspection of Defendant's records.

(b)     Typicality: As required by Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the claims of all Class members since Plaintiff and all members of the Classes suffered damages as result of Defendant's concealment and wrongful conduct set forth herein.

(c)     Adequacy: As required by Fed. R. Civ. P. 23(a)(4), Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has no interests adverse or antagonistic to those of the Classes and has retained counsel competent and experienced in class action litigation who will zealously prosecute this matter on behalf of the Classes to its conclusion. Plaintiff will fairly and adequately protect the interests of each Class member. Plaintiff acknowledges he has an obligation to make known any relationship, conflicts, or differences with any class member. Plaintiff's attorneys are well-versed in the rules governing class action discovery, certification, and settlement.

(d)     Commonality: There are common questions of law and fact as to the Class and Subclasses and that predominate over questions affecting only individuals, including but not limited to whether GM has engaged in fraud and unfair competition, and whether Plaintiff and Class Members are entitled to injunctive relief enjoining Defendants from continuing to omit the grill  shutter as a part to which they are entitled to repair or replacement coverage under California's statutory emission warranties.

(e)     Superiority: As required by Fed. R. Civ. P. 23(b)(3), the nature of this action makes the use of class action adjudication superior to other methods. A class action will achieve economies of time, effort, and expense as compared with separate lawsuits, and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner and at the same time for the entire Class.

(f)     Defendant keeps extensive computerized records of its customers. Defendant has one or more databases through which a significant majority of Class members may be identified and ascertained, and it maintains contact information, including email and home mailing addresses,

1    through which notice of this action could be disseminated in accordance with due process

2    requirements.

3          190.    Class certification of Plaintiff's claims is also appropriate pursuant to, *inter alia,*

4    Fed. R. Civ. P. 23(b)(2) and (c)(4) because Defendant has acted or refused to act on grounds

5    generally applicable to Plaintiff and the Classes, making appropriate both declaratory and

6    injunctive relief with respect to Plaintiff and the Classes.

7                    **TOLLING OF THE STATUTE OF LIMITATIONS**

8          191.    GM engaged in misleading and dishonest conduct relating to its failure to identify

9    the grill shutter as covered for 7 years or 70,000 miles pursuant to the California Code of

10   Regulations regarding the California Emissions Warranty. Despite acting diligently, Plaintiff and

11   Class members lacked the resources and had no realistic ability to identify the grill shutter as a part

12   that should have been covered. Plaintiff and Class members cannot be reasonably expected on their

13   own to learn or discover what parts should be covered under the California Emissions Warranty.

14   Therefore, the delayed discovery rule is applicable to the claims asserted by Plaintiff and Class

15   members, and the statute of limitations for bringing the claims set forth herein should be tolled.

16         192.    GM has actual and constructive knowledge that it is violating California law by

17   failing to identify the grill shutter as a part that should be covered under the California Emissions

18   Warranty. GM has concealed from Plaintiff and Class members that GM is violating California law

19   as set forth herein. Any applicable statute of limitation is tolled by GM's wrongful conduct set

20   forth herein, and GM is estopped from relying on any statute of limitation because of its conduct.

21                         **FIRST CAUSE OF ACTION**

22   **VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200**

23         **(By Plaintiff and the Classes Against GM and Doe Defendants)**

24         193.    Plaintiff re-alleges and incorporates by reference each allegation set forth above.

25         194.    California Business and Professions Code section 17200, *et seq.* (the "UCL")

26   prohibits "any unlawful, unfair or fraudulent business act or practice." GM has committed acts of

27   unfair competition proscribed by the UCL, including the acts and practices alleged herein.

28

195.     The UCL imposes strict liability. Plaintiff need not prove that GM intentionally or negligently engaged in unlawful or unfair business practices – only that such practices occurred.

196.     GM is a "person" as defined by Business & Professions Code § 17201.

197.     As a direct and proximate result of GM's acts and practices in violation of the UCL, Plaintiff and members of the Classes have suffered injury in fact and lost money or property as set forth above and will continue to do so.

198.     **Unlawful Prong**.   A business practice is "unlawful" under the UCL if it is forbidden by law or regulations, including standard of professional conduct. The violation of any law or regulation may serve as the predicate for a violation of the "unlawful" prong of the UCL.

199.     GM failed to comply with the California Emissions Warranty requirements pursuant to the CCR by failing to provide 7-year and 70,000-mile warranty coverage for the grill shutters installed in the Class Vehicles where coverage should be provided pursuant to the CCR. The California Emissions Warranty applies to all Class Vehicles. 13 CCR 2037(a). Pursuant thereto, manufacturers shall warrant that their vehicles conform with the California Air Resources Board regulations and are free from defects which cause the failure of a warranted part to perform as described in the application for certification, including defects which would cause the vehicle's on-board diagnostic malfunction indicator to illuminate, for 3 years or 50,000 miles. 13 CCR 2037(b)(1)- (2). The vehicle manufacturer is GM, which is the manufacturer granted certification for the Class Vehicles. 13 CCR 2035(c)(5). The parts at issue are all warranted parts. The warranty period shall be 7 years and 70,000 miles for high-priced emissions parts. 13 CCR 2037(b)(3). High-priced emissions parts are those parts which, when taking into consideration the cost to diagnose, replace and pay for the failed part, exceed the cost limit defined in 13 CCR 2037(c)(3). The California Air Resources Board published memos which calculated the cost limit for the Class period. Although the grill shutters installed in the Class Vehicles exceeded the cost limit for the correlating years and should have received California Emissions Warranty coverage, GM failed to provide 7-year and 70,000-mile warranty coverage for said parts. The failure has resulted in damage to Plaintiff and members of the Classes.

200.    GM did not designate the parts at issue as high-priced "emissions-related" warranted parts that should be covered by the 7-year and 70,000-mile California High-Priced Emissions-Related Parts Warranty. Thereby, GM also was able to avoid identifying the grill shutters installed in the Class Vehicles as defined herein where coverage should be provided pursuant to the CCR as being high-priced warranted parts in the warranty books for the Class vehicles, which purport to identify all parts covered under the high-priced California Emissions Warranty for 7 years and 70,000 miles. GM's violation of Section 2037(c)(1)(B) directly affected communications with consumers. By violating Section 2037(c)(1)(B), GM was able to avoid disclosing in the warranty books that the grill shutters should have been included as high-priced warranted parts.

201.    GM's acts of unlawful competition as set forth above have caused members of the Classes to suffer damage, present a continuing threat, and will persist and continue to do so unless and until this Court issues appropriate injunctive relief. Plaintiff also seeks attorneys' fees and costs pursuant to, inter alia, C.C.P. Section 1021.5.

202.    **Unfair Prong**.  GM's conduct violates the unfair prong of the UCL.

203.    An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition and is not an injury the consumers themselves could reasonably have avoided. An act or practice also is unfair if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. An act or practice also is unfair if Plaintiff's claims are "tethered" to specific constitutional, statutory or regulatory provisions. GM's conduct violates all of these definitions.

204.    As alleged above, GM engages and has engaged in a systematic business practice of intentionally failing to identify in the Class Vehicles' warranty books at the time of distribution, and in resources provided to its dealerships, numerous parts that GM is obligated to identify as high-priced warranted parts by operation of law, including specifically the grill shutters installed in the Class Vehicles where coverage should be provided pursuant to the CCR. GM does this in an effort to reduce the amount of money that GM spends on warranty-related repairs knowing that it

would be very difficult if not impossible for most consumers to discover this unlawful conduct on their own. If GM complied with California law and properly identified the grill shutter as a high-priced warranted part, then GM dealerships would properly provide warranty coverage for said parts. Further, GM's conduct is unfair because it intentionally refuses to provide warranty coverage for the grill shutters installed in the Class Vehicles as defined herein for the sole purpose of wrongfully limiting its warranty claims, with no regard for the fact that the public is being forced to pay for repairs which should be covered under the 7-year and 70,000-mile California Emissions Warranty. Plaintiff and members of the Classes have suffered injury in fact and lost money or property as a result of GM's unfair business acts and practices as set forth in detail.

205.    GM's failure to properly identify the grill shutters installed in the Class Vehicles as being covered for 7 years or 70,000 miles, where said coverage should be provided pursuant to the CCR, is a uniform, systematic, and intentional business practice on the part of GM to minimize the amount of money that GM has to pay out in warranty claims. This conduct violates California law.

206.    As a direct and proximate result of GM's acts and practices in violation of the UCL, Plaintiff and members of the Classes have paid out of pocket to repair or replace the grill shutters installed in the Class Vehicles where coverage should be provided pursuant to the CCR and/or other high-priced warranted parts as defined herein that should have been covered by GM under the 7-year and 70,000-mile California Emissions Warranty. As a result, consumers were denied warranty coverage, which is clearly unfair.  GM's conduct does not benefit consumers or competition. Plaintiff and members of the Classes could not reasonably avoid the injury each of them suffered or will suffer, which injury is substantial. GM's conduct only benefits GM, by GM wrongfully avoiding having to pay warranty claims which should be covered by the California Emissions Warranty.

207.    The gravity of the consequences of GM's conduct as described above outweighs the justification, motive or reason therefor, is immoral, unethical and unscrupulous. GM's conduct also offends established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, including California laws and regulations regarding the California Emissions

Warranty, or is substantially injurious to the public, for the reasons set forth above.

208.    To the extent that any definition of "unfair" requires a balancing test or weighing various factors, such an inquiry is fact intensive and requires a full factual record as to GM's justification and motives for its conduct, and as to the impact of GM's conduct on Plaintiff and members of the Classes.

209.    GM's acts of unfair competition as set forth above present a continuing threat and will persist and continue to do so unless and until this Court issues appropriate injunctive relief.

210.    Plaintiff also seeks attorneys' fees and costs pursuant to, inter alia, Cal. Code Civ. Proc. § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief and judgment against GM as follows:

1.    For an order certifying this case as a class action, appointing Plaintiff as the representative of the Classes and Subclasses, and appointing counsel for Plaintiff as Class Counsel;

2.    That the Court declare, adjudge and decree that that GM is financially responsible for notifying all Class members about the wrongful conduct set forth herein; that GM's conduct as alleged herein violates the California Emissions Warranty including, without limitation, because GM has used, and continues to use, the wrong or incorrect standards for identifying "emissions-related" bumper shutters under the California Emissions Warranty; GM failed and is failing to properly identify and warrant under the California Emissions Warranty for 7 years or 70,000 miles the grill shutter, and/or that Plaintiff and the members of the Classes are entitled to said warranty coverage under California Emissions Warranty for the grill shutter, which should be properly identified as a high-priced warranted part under the California Emissions Warranty as described or defined herein; and, an order requiring GM to, *inter alia*, review its warranty books for all Class Vehicles and properly identify and warrant the grill shutter as covered for 7 years or 70,000 miles, and, on a going forward basis, use the proper standard for determining whether the grill shutter is a high-priced "emissions-related" under the California Emissions Warranty;

3.      That the Court declare, adjudge and decree that that GM is responsible for notifying all Class members about the wrongful conduct set forth herein;

4.      That the Court declare, adjudge and decree that GM's failure to identify and warrant the grill shutters as described herein for 7 years or 70,000 miles, pursuant to the California Emissions Warranty, constitutes an unfair and unlawful business practice in violation of California Business and Professions, Civil Code sections 17200, *et seq.*;

5.      For an order declaring and enjoining GM from further unfair and unlawful distribution, sales, and lease practices and compelling Defendant to properly and fully identify that the grill shutters as described herein are covered for 7 years or 70,000 miles pursuant to the California Emissions Warranty. As ancillary relief and as a result of the declaratory and/or injunctive relief to be obtained, GM will provide restitution for amounts wrongfully paid by Plaintiff and Class members relating to these repairs which should have been covered by GM under the California Emissions Warranty;

6.      For an award of restitution to Plaintiff and Class members of any repair costs they are owed;

7.      For the appointment of a receiver, as necessary to receive, manage and distribute any and all funds from GM that are determined to have been wrongfully acquired by GM as a result of violations of California Business & Professions Code sections 17200, *et seq.*;

8.      For an award of attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5, or as may otherwise be allowed by law;

9.      For an award of pre-judgment and post-judgment interest;

10.     For leave to amend the Complaint to conform to the evidence produced at trial; and,

11.     For all other relief as may be appropriate under the circumstances.

WHEREFORE, Plaintiff, on behalf of himself and for the benefit of the general public prays for public injunctive relief, and further prays for relief and judgment against GM as follows:

1.      For an Order declaring, *inter alia*, that GM, on a going forward basis, use the proper standard for calculating whether an emissions-related part is also a high-priced part under the

1  California Emissions Warranty, namely that GM use the "customer pay rate" i.e., (the number of

2  labor hours that the customer pays for the repair) instead of the number of hours that the manufacturer

3  pays its dealers to perform the repairs under warranty ("warranty pay");

4          2.      For an award of attorneys' fees and costs pursuant to California Code of Civil

5  Procedure § 1021.5, or as may otherwise be allowed by law;

6          3.      For leave to amend the Complaint to conform to the evidence produced at trial; and,

7          4.      For all other relief as may be appropriate under the circumstances.

8      WHEREFORE, Plaintiff, on behalf of himself, further prays for relief and judgment against

9  GM as follows:

10         1.      For declaratory relief that GM is in violation of, and must comply with, the

11  California Emissions Warranty namely, that GM, *inter alia*, identify and cover the grill shutters as

12  described herein as covered for 7 years or 70,000 miles under the California Emissions Warranty;

13         2.      For declaratory relief that the correct standard for calculating whether an emissions-

14  related part is also a high-priced part under the California Emissions Warranty is to use the

15  "customer pay rate" i.e., the number of labor hours that the customer pays for the repair), not the

16  number of hours that the manufacturer pays its dealers to perform the repairs under warranty

17  ("warranty pay").

18         3.      For an award of attorneys' fees and costs pursuant to California Code of Civil

19  Procedure § 1021.5, or as may otherwise be allowed by law;

20         4.      For leave to amend the Complaint to conform to the evidence produced at trial; and,

21         5.      For all other relief as may be appropriate under the circumstances.

22  Dated: August 23, 2023                    Respectfully submitted,

23                                            **POMERANTZ LLP**
                                              **THE LAW OFFICE OF ROBERT STARR**
24                                            **FRONTIER LAW CENTER**

                                             By:        /s/ Robert L. Starr
25                                              _____

26                                                  Jordan L. Lurie
                                                    Ari Y. Basser
27                                                  Robert L. Starr
                                                    Manny Starr
28
                                                  *Attorneys for Plaintiff*